KELLEY *v.* SOUTHERN PACIFIC CO.

No. 73-1270.   Argued October 22, 1974—Decided December 23, 1974

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 332. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 333. BLACKMUN, J., filed a dissenting opinion, *post*, p. 341.

*R. Jay Engel* argued the cause and filed briefs for petitioner.

*John J. Corrigan* argued the cause for respondent. With him on the brief was *Donald O. Roy*.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner Eugene Kelley was seriously injured when he fell from the top of a tri-level railroad car where he had been working. He sought recovery for his injuries from the respondent railroad under the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60. Under the FELA, a covered railroad is liable for negligently causing the injury or death of any person "while he is employed" by the railroad. Although petitioner acknowledged that he was technically in the employ of a trucking company rather than the railroad, he contended that his work was sufficiently under the control of the railroad to bring him within the

coverage of the FELA. The District Court agreed, but the Court of Appeals for the Ninth Circuit reversed, 486 F. 2d 1084 (1973), creating an apparent conflict with a previous decision of the Fourth Circuit, *Smith* v. *Norfolk & Western R. Co.*, 407 F. 2d 501, cert. denied, 395 U. S. 979 (1969).[1] We granted certiorari to resolve the conflict. 416 U. S. 935 (1974). We vacate the judgment and remand the case for further proceedings in the District Court.

## I

At the time of his accident, petitioner had worked for the Pacific Motor Trucking Co. (PMT), a wholly owned subsidiary of the Southern Pacific Co., for about eight years.[2] PMT was engaged in various trucking enterprises, primarily in conjunction with the railroad operations of its parent company. Among PMT's functions was transporting new automobiles from respondent's San Francisco railyard to automobile dealers in the San Francisco area. As part of its contractual arrangement with

---

[1] Very similar fact situations have arisen in a number of federal and state cases. *E. g., Tarboro* v. *Reading Co.*, 396 F. 2d 941 (CA3 1968), cert. denied, 393 U. S. 1027 (1969); *Mazzucola* v. *Pennsylvania R. Co.*, 281 F. 2d 267 (CA3 1960); *Cimorelli* v. *New York Central R. Co.*, 148 F. 2d 575 (CA6 1945); *Thornton* v. *Norfolk & Western R. Co.*, 307 F. Supp. 667 (ED Va. 1969); *Hunter* v. *Missouri-Kansas-Texas R. Co.*, 258 F. Supp. 20 (ND Okla. 1966); *Fawcett* v. *Missouri Pacific R. Co.*, 242 F. Supp. 675 (WD La. 1963), aff'd *per curiam*, 347 F. 2d 233 (CA5), cert. denied, 382 U. S. 907 (1965); *Valentine* v. *South Coast Corp.*, 218 F. Supp. 148 (ED La. 1963), aff'd *per curiam*, 334 F. 2d 244 (CA5 1964); *Williams* v. *Chicago & Eastern Illinois R. Co.*, 13 Ill. App. 3d 596, 300 N. E. 2d 766 (1973); *Waters* v. *Chicago & Eastern Illinios R. Co.*, 86 Ill. App. 2d 48, 229 N. E. 2d 151 (1967); *Turpin* v. *Chicago, B. & Q. R. Co.*, 403 S. W. 2d 233 (Mo.), cert. denied, 384 U. S. 1003 (1966); *Drago* v. *Central R. Co.*, 93 N. J. L. 176, 106 A. 803, cert. denied, 251 U. S. 553 (1919).

[2] Petitioner has abandoned his claim that PMT's status as respondent's wholly owned subsidiary should render respondent liable generally for injuries to PMT employees.

the railroad, PMT would unload automobiles from Southern Pacific's "tri-level" auto-carrying flatcars when they arrived in the yard. It was petitioner's job to unhook the automobiles from their places on the railroad cars and to drive them into the yard for further transfer to PMT auto trailers. PMT maintained the unloading operation in the yard on a permanent basis. Although there were Southern Pacific employees in the area who would occasionally consult with PMT employees about the unloading process, PMT supervisors controlled and directed the day-to-day operations.

On July 3, 1963, petitioner was unhooking automobiles in the usual fashion from the top level of one of the tri-level flatcars. A safety cable, normally affixed to the flatcar to protect against falls, was apparently not in place because of an equipment defect. During the unhooking process, petitioner fell from the top of the car and suffered a disabling injury. He subsequently received workmen's compensation payments from PMT. Shortly before the three-year FELA statute of limitations had run, he brought suit against the respondent,[3] claiming it had been negligent in failing to maintain the safety cable in its proper place and in proper working order.

In his complaint, petitioner alleged that he was employed by the respondent railroad within the meaning of the FELA. After a six-day hearing, the District Court, sitting as trier of fact,[4] ruled in petitioner's favor on the employment question. The job of unloading

---

[3] In most FELA cases a finding of nonemployment does no more than deprive the plaintiff of the various procedural and proof advantages of the Act, since the common-law negligence action against a nonemployer is generally available in the alternative. In this case, however, when petitioner brought his FELA suit, the statute of limitations for California's common-law negligence action had already run.

[4] Although both parties initially demanded a jury trial, they agreed to try the limited question of employment to the court.

automobiles was the railroad's responsibility, the court found, "pursuant to its contractual responsibilities to the shippers and its tariff responsibilities." In addition, the court found that the railroad supplied the necessary ramps and owned the area in which the PMT employees worked. The responsibility for supervision and control of the unloading operations was respondent's, the court concluded, even though "the exercise thereof was executed by employees of Pacific Motor Trucking Company." In sum, the court found that PMT was serving generally as the railroad's agent; PMT employees were agents of the railroad for the purposes of the unloading operation; and because the work being performed by petitioner was "in fulfillment of a non-delegable duty of defendant Southern Pacific Company," the relationship between petitioner and the railroad was sufficient to bring him within the coverage of the FELA. After this resolution of the employment issue, the railroad stipulated to its negligence, the parties agreed to set damages at $200,000, and the trial court entered judgment for petitioner in that amount.

The Court of Appeals observed that the District Court had not found that petitioner was "employed" by the railroad, either permanently or at the time of his accident. The court noted that the "while employed" clause of the FELA requires a finding not just of agency but of a master-servant relationship between the rail carrier and the FELA plaintiff. Concluding that the District Court had applied an unduly broad test for FELA liability, the Court of Appeals reversed the District Court's judgment.

## II

Petitioner insists that the District Court in effect made a factual finding of employment and that the Court of Appeals erred in upsetting that finding. Of course, even

if the District Court made such a finding of employment after applying the proper principles of law, that would not be the end of the matter. Under Fed. Rule Civ. Proc. 52 (a), an appellate court must set aside the trial court's findings if it concludes that they are "clearly erroneous." See *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 394–395 (1948). We need not reach the question whether any of the District Court's findings in this case were clearly erroneous, however, since we agree with the Court of Appeals that the trial court applied an erroneous legal standard in holding that the plaintiff was within the reach of the FELA. *United States* v. *Singer Mfg. Co.*, 374 U. S. 174, 194 n. 9 (1963).

The heart of the District Court's analysis was its conclusion that the "traditional agency relationship" between respondent and PMT, in conjunction with the master-servant relationship between PMT and petitioner, was sufficient under the circumstances of this case to bring petitioner under the coverage of the Act. But this Court has repeatedly required more than that to satisfy the "while employed" clause of the FELA. From the beginning the standard has been proof of a master-servant relationship between the plaintiff and the defendant railroad. See *Robinson* v. *Baltimore & Ohio R. Co.*, 237 U. S. 84, 94 (1915); *Hull* v. *Philadelphia & Reading R. Co.*, 252 U. S. 475, 479 (1920); *Baker* v. *Texas & Pacific R. Co.*, 359 U. S. 227, 228 (1959).

In an early FELA case, this Court noted that the words "employee" and "employed" in the statute were used in their natural sense, and were "intended to describe the conventional relation of employer and employé." *Robinson, supra,* at 94. In *Baker, supra,* the Court reaffirmed that for the purposes of the FELA the question of employment, or master-servant status, was to be determined by reference to common-law principles. The

Court in *Baker* referred to sections of the Restatement (Second) of Agency dealing with the borrowed-servant doctrine and the general master-servant relationship as a guideline for analysis and proper jury instructions.[5] Section 220 (1) of the Restatement defines a servant as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." In § 220 (2), the Restatement recites various factors that are helpful in applying that definition. While that section is directed primarily at determining whether a particular bilateral arrangement is properly characterized as a master-servant or independent contractor relationship, it can also be instructive in analyzing the three-party relationship between two employers and a worker.

Under common-law principles, there are basically three methods by which a plaintiff can establish his "employment" with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. See Restatement (Second) of Agency § 227; *Linstead* v. *Chesapeake & Ohio R. Co.*, 276 U. S. 28 (1928). Second, he could be deemed to be acting for two masters simultaneously. See Restatement § 226; *Williams* v. *Pennsylvania R. Co.*, 313 F. 2d 203, 209 (CA2 1963). Finally, he could be a subservant of a company that was in turn a servant of the railroad. See Restatement § 5 (2); *Schroeder* v. *Pennsylvania R. Co.*, 397 F. 2d 452 (CA7 1968).

---

[5] A year later, in *Ward* v. *Atlantic Coast Line R. Co.*, 362 U. S. 396, 400 (1960), the Court again cited the Restatement as the proper basis for instructing a jury on the various factors that bear on the factual question of employment. The Court in *Ward* approved an instruction that incorporated several of the factors mentioned in Restatement § 220.

Nothing in the District Court's findings suggests that petitioner was sufficiently under the control of respondent to be either a borrowed servant of the railroad or a dual servant of the railroad and PMT.[6] The District Court's findings come closest to suggesting a subservant relationship running from the railroad through PMT to petitioner. But even that theory fails on the findings in the trial court, since those findings did not establish the master-servant relationship between respondent and PMT necessary to render petitioner a subservant of the railroad.

The District Court found that PMT employees exercised supervision and control over the unloading operations, although the railroad bore the "responsibility" for those functions. On these facts, the District Court was plainly correct in concluding that PMT was an agent of the railroad. But a finding of agency is not tantamount to a finding of a master-servant relationship. See Restatement (Second) of Agency § 2. The finding that the railroad was "responsible" for the unloading operations is significantly weaker than would be a finding that it controlled or had the right to control the physical conduct of the PMT employees in the course of their unloading operations. The railroad would satisfy the District Court's "responsibility" test whenever it agreed to perform a serv-

[6] It appears that the District Court consciously declined to make a finding of "employment" or master-servant relationship between the railroad and Kelley. Petitioner proposed findings that respondent "had the right to exercise control over the details of the work being performed by [petitioner]," that the parties "believed that a relationship of master and servant existed" between them, and that petitioner "was an 'employee' of defendant Southern Pacific Company." The court declined to make any of these three proposed findings, although it adopted several of petitioner's less critical proposed findings in whole or in part. Moreover, the court specifically found that at the time of his injury, petitioner was in the employment of PMT, a finding that petitioner, of course, had not requested.

ice and subsequently engaged another company to perform that service for it on its premises. The "control or right to control" test, by contrast, would be met only if it were shown that the role of the second company was that of a conventional common-law servant.[7] Accordingly, we agree with the Court of Appeals that the District Court's test for FELA coverage was too broad.

## III

The dissenters argue that even if the District Court erred in defining the applicable legal standard, we should reverse the Court of Appeals and reinstate the judgment of the District Court. The facts found by the District Court, they contend, satisfied the requirements of the "while employed" clause, even under the proper test. We disagree.

As we noted in Part II, the District Court's findings concerning the contractual relationship between PMT and the railroad fall far short of compelling the conclusion that Kelley was employed by Southern Pacific. The court's other factual determinations add no more force to the claim. The findings that Kelley's crew worked most of the time on the railroad's premises and that railroad employees were responsible for checking safety conditions

[7] The District Court appeared to place substantial weight on its finding that the unloading operation was a "non-delegable duty" of the railroad, "pursuant to its contractual responsibilities to the shippers and its tariff responsibilities." But the fact that respondent undertook the contractual obligation to unload the cars and added the unloading cost to its overall charge to the shipper does not affect the nature of its arrangement with PMT. The railroad was free either to use its own employees to unload the automobiles or to subcontract the work to another company. Nor did the publication of tariffs for the unloading services automatically render anyone who performed those tasks an employee of the railroad for FELA purposes. See *Norman* v. *Spokane-Portland & S. R. Co.*, 101 F. Supp. 350 (Ore. 1950), aff'd *per curiam*, 192 F. 2d 1020 (CA9 1951).

on the tri-level cars reflect the fact that the activities of the two companies were closely related and necessarily had to be coordinated. Railroad employees tending the cars and PMT employees unloading them naturally had substantial contact with one another. In addition, Southern Pacific supervisory personnel were occasionally in the area where PMT conducted its unloading operations and from time to time would advise or consult with PMT employees and supervisors. But the trial court did not find that Southern Pacific employees played a significant supervisory role in the unloading operation or, more particularly, that petitioner was being supervised by Southern Pacific employees at the time of his injury.[8] Nor did the court find that Southern Pacific employees had any general right to control the activities of petitioner and the other PMT workers.[9]

The two companies were sufficiently distinct in organization and responsibility that there was no apparent overlap in the supervisory ranks. Indeed, the labor con-

---

[8] Petitioner has pointed to testimony from PMT employees who stated that in the course of the unloading operation they had contact with various Southern Pacific employees, including clerks, who would check on arriving and departing cars, "car-whackers," who were responsible for car maintenance and inspection, and switchmen, who would occasionally ask the PMT employees to indicate when they were finished working on a car so that the switch engine could clear the tracks. These contacts, however, were plainly not supervisory in nature and do not buttress petitioner's claim to railroad employment.

[9] In addition to the findings discussed above, the District Court found that petitioner had worked for PMT for a substantial period, that he performed unskilled labor, and that he was compensated by an hourly wage. While these factors are generally relevant to the employment inquiry, see Restatement (Second) of Agency §§ 220 (2) (d), (f), (g), we fail to see how they aid petitioner here. They make it plain that Kelley was a general servant of PMT, but neither the District Court nor the dissenters explain how they bear significantly on respondent's control over or right to control Kelley's activities.

tract between the Teamsters and PMT expressly provided that the PMT employees would be subject only to the control of PMT supervisors. In light of the analysis in this Court's previous cases, the District Court's findings clearly fail to establish that petitioner was "employed" by the railroad.

In *Robinson* v. *Baltimore & Ohio R. Co.*, *supra*, the petitioner was an employee of the Pullman Company, serving as porter in charge of a Pullman car that was hauled by the respondent railroad. Although the Pullman employees worked closely with railroad employees, and although the Pullman car was an integral part of the railroad operation, the Court held that that was not enough to make petitioner an employee of the railroad for the purposes of the Act. Even the petitioner's responsibility for taking tickets or fares of passengers boarding the Pullman car at night was not enough to make him a servant of the railroad. This service was merely an accommodation to the railroad, not a demonstration of the railroad's right to control the conduct of the Pullman employee. The Court stated that at the time the Act was passed, "[i]t was well known that there were on interstate trains persons engaged in various services for other masters. Congress, familiar with this situation, did not use any appropriate expression which could be taken to indicate a purpose to include such persons among those to whom the railroad company was to be liable under the Act." 237 U. S., at 94. The Pullman company, like PMT in this case, selected its own employees, and it "defined their duties, fixed and paid their wages, directed and supervised the performance of their tasks, and placed and removed them at its pleasure." *Id.*, at 93.

In the following year, the Court was again faced with the question whether a particular worker was an employee of the railroad that had caused his death, or whether he

was an independent contractor. *Chicago, R. I. & P. R. Co.* v. *Bond,* 240 U. S. 449 (1916). The decedent had been engaged by the railroad to procure coal and wood and to perform various other services at its loading center in Enid, Okla. Although the railroad directed the decedent's activities to some extent, the Court observed that those directions were simply reformulations of the flexible obligations assumed by the decedent under his contract, not "a detailed control of the actions of [decedent] or those of his employees." *Id.,* at 455–456. The arrangement by which decedent had been engaged to provide services for the railroad, the Court concluded, was "not the engagement of a servant submitting to subordination and subject momentarily to superintendence, but of one capable of independent action, to be judged of by its results." *Id.,* at 456.

In *Bond* the Court relied on the earlier decision in *Standard Oil Co.* v. *Anderson,* 212 U. S. 215 (1909), to clarify the distinction between a contractor and an employee. In that case, a longshoreman was injured when a winch operator negligently lowered a load of oil cases on him. Petitioner, the general employer of the negligent winchman, argued that at the time of the accident the winchman was the borrowed servant of the stevedoring company, the longshoreman's employer. The Court, however, held that the winchman was not a servant of the stevedore but the servant of an independent contractor. The general employer had not furnished the employee to the stevedore, the Court wrote; it had furnished only the employee's work. Focusing on the locus of the power to control and direct the servant's work, the Court emphasized the importance of distinguishing between "authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Id.,* at 222. Cf.

*Denton* v. *Yazoo & Mississippi Valley R. Co.,* 284 U. S. 305 (1932).

In this case, as in *Anderson,* the evidence of contacts between Southern Pacific employees and PMT employees may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation. See *Del Vecchio* v. *Pennsylvania R. Co.,* 233 F. 2d 2, 5 (CA3 1956). The informal contacts between the two groups must assume a supervisory character before the PMT employees can be deemed *pro hac vice* employees of the railroad.[10]

---

[10] The Court in *Shenker* v. *Baltimore & Ohio R. Co.,* 374 U. S. 1 (1963), applied the analysis of *Standard Oil Co.* v. *Anderson,* 212 U. S. 215 (1909), in a factual setting somewhat analogous to that of the present case. The petitioner in *Shenker* was employed as a janitor for the B&O Railroad. In addition to his work for the B&O, he maintained a nearby rail station and performed various services for the Pittsburgh & Lake Erie Railroad (P&LE). Although petitioner was on P&LE's premises and was doing P&LE's work when he was injured, the Court noted that "there can be no question that the petitioner is an employee of the B&O." 374 U. S., at 5. Citing *Anderson,* the Court wrote:

"[U]nder the common law loaned-servant doctrine immediate control and supervision is critical in determining for whom the servants are performing services. In the present case, the undisputed facts show that the petitioner was at all times paid by the B&O and under the sole supervision of B&O employees. The intimations of the B&O that the petitioner might have been given directions by the P&LE baggageman is at most an example of the minimum cooperation necessary to carry out a coordinated undertaking, and, as noted in *Anderson,* cannot amount to control or supervision." *Id.,* at 6 (footnote omitted).

Accord, *Hull* v. *Philadelphia & Reading R. Co.,* 252 U. S. 475, 479–480 (1920). In *Linstead* v. *Chesapeake & Ohio R. Co.,* 276 U. S. 28 (1928), the Court held that the borrowed-servant test was met where an employer had made the services of several of its employees available to the C&O Railroad for a specific purpose. Linstead, a conductor employed by the Big Four Railroad was instructed to

The factual setting of *Baker* v. *Texas & Pacific R. Co.,* *supra,* provides an instructive contrast. Petitioner in *Baker* was nominally employed by a contractor who was engaged in maintenance work for the railroad. At trial, he introduced evidence to show that his work was part of the maintenance task of the railroad and that the material he was pumping into the roadbed was supplied by the railroad. Most significantly, there was evidence to show that

> "a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture." 359 U. S., at 228–229.

Because the evidence of control or right to control was in serious dispute, the Court held that the case must be permitted to go to the jury. As we have indicated, however, the District Court found no such day-to-day supervision that would support a finding that petitioner and his coworkers were, in effect, employees of the railroad.

## IV

We part company with the Court of Appeals on the propriety of a remand. The court rendered judgment for respondent apparently because it determined that the District Court had found that there was no employment relationship, or because it had decided on its own that any such finding would have been clearly erroneous. Yet, while the District Court's failure to adopt peti-

accompany a C&O train along C&O tracks between Kentucky and Ohio, under the immediate supervision of a C&O trainmaster. On these facts the Court held that he was the "special employee" of the C&O and could recover from the railroad under the FELA.

tioner's proposed findings of fact relating to employment is of some significance in determining what that court deemed to be the requirements of the "while employed" clause, see n. 6, *supra,* it is not enough to constitute a reviewable finding that there was no master-servant relationship between petitioner and the railroad. Similarly, while the Court of Appeals may have meant to suggest that in its view the record could not support a finding of employment, that suggestion is not developed in its opinion, and we think the best course at this point is to require the trier of fact to re-examine the record in light of the proper legal standard. Accordingly, we vacate the judgment of the Court of Appeals and remand the case to that Court with instructions to remand the case to the District Court for further findings in accordance with this opinion.

*Vacated and remanded.*

MR. JUSTICE STEWART, concurring in the judgment.

In determining Kelley's status under the FELA, the District Judge apparently relied on general agency principles, rather than on the particular principles of master-servant law. This was error, and it is thus proper to remand this case to the District Judge so that he can take a fresh look at the record, in light of the correct legal standard.

The correct standard is not a novel one. The law of master and servant has been with us for a long time, and its adequate exposition elsewhere, *e. g.,* Restatement (Second) of Agency §§ 5 (2), 220, 226, and 227 renders much of the Court's extended discussion unnecessary. But my chief problem with the Court's opinion is its insistence upon dissecting the particularized evidence in this case. Whether or not the Southern Pacific Co. controlled or had the right to control Kelley's work is for the original factfinder to determine.

The Court today substantially invades the trial court's function. If the Court wishes to decide the issue itself, a remand is unnecessary. If the Court wishes to leave the decision to the District Judge, who saw the evidence and heard the witnesses, much of the detailed discussion of the evidence in the Court's opinion is gratuitous.

I believe that both the efficient allocation of judicial resources and the ends of justice are best served by a remand—but a genuine remand, affording the District Judge latitude to perform his proper function as fact-finder. Because the Court's opinion bristles with broad hints that a finding of FELA coverage would be clearly erroneous, its remand of this case seems to me to approach disingenuousness.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

Today's decision marks a return to the era when the FELA was interpreted in a hostile and restrictive manner by the federal judiciary. Accordingly, I am constrained to register my dissent.

The first Employers' Liability Act was enacted in 1906, 34 Stat. 232, and this Court responded by holding the Act unconstitutional. *Employers' Liability Cases*, 207 U. S. 463 (1908). Congress tried again in 1908 and produced the Act which is now in effect. 35 Stat. 65, 45 U. S. C. § 51 *et seq.* This time the Court upheld the statute, *Second Employers' Liability Cases*, 223 U. S. 1 (1912), but judicial hostility did not end. The defense of assumption of risk was, for the most part, held to be still available to the employer. *Seaboard Air Line R. Co.* v. *Horton*, 233 U. S. 492 (1914). The Act sought expressly to control the use of a contributory negligence defense, but the Court circumvented this to a considerable degree by developing the doctrine of "primary duty." See *Great Northern R. Co.* v. *Wiles*, 240 U. S. 444 (1916).

Finally, in 1939, the Congress decided that further legislation was needed. 53 Stat. 1404. The result was a more liberal view of the Act which did not provide the employer with so many defenses. See *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54 (1943).

Since 1939 this Court has interpreted the Act in the spirit of those amendments. Gradual liberalization has occurred, and the narrow, technical approach of earlier years has been eschewed. See W. Prosser, Law of Torts 536–537 (4th ed. 1971). This development did not occur without dissent. Divisions of opinion occurred on the merits and also on the question of whether the Court should involve itself in this area at all. See, *e. g.*, *Rogers* v. *Missouri Pacific R. Co.*, 352 U. S. 500 (1957). Nevertheless, the Court continued to oversee the application of the Act and to insist that judicial interpretations be consistent with the Act's overall purpose.

One of the questions which has arisen under the Act has been the definition of employment. Section 1 of the FELA, 45 U. S. C. § 51, provides that the carrier is liable in damages for injury or death resulting to an employee from the carrier's negligence. But the damage must be done to the one injured or killed "while he is employed" by the carrier. In the past judges have sometimes tried to give this requirement a rigid, technical content, but such an approach has been rejected by this Court.

In *Baker* v. *Texas & Pacific R. Co.*, 359 U. S. 227 (1959), the petitioner's decedent had been hired as a workman by W. H. Nichols & Co., a firm which had entered into a contract with the respondent railroad. The decedent was working along the main line of the railroad performing various operations designed to strengthen and stabilize the roadbed. He was killed when he was struck by a train. The trial judge refused to submit the issue of employment to the jury and held that as a matter of

law the decedent was not in an employment relationship with the railroad at the time of his death. This Court reversed on the ground that whether the decedent was an employee within the meaning of the Act was properly a question for the jury. Noting that the terms "employee" and "employed" are not used in any "special sense," the Court reasoned that the issue of employment "contains factual elements such as to make it one for the jury under appropriate instructions as to the various relevant factors under law. See Restatement, Agency 2d, § 220, comment c; § 227, comment a." Id., at 228.

*Ward* v. *Atlantic Coast Line R. Co.*, 362 U. S. 396 (1960), involved similar considerations to those in *Baker*. The petitioner was employed as a laborer by the railroad, but he was working on his day off with a crew which was fixing a siding track that belonged to a third party. Since the petitioner was being paid by this third party on the day of the injury, a question existed as to whether the petitioner was an employee of the railroad at the time of the accident. We held that the trial judge had improperly charged the jury to consider only one factor, that of the awareness of the victim that he was working for a third party on the day in question. We noted that a number of factors must be considered under Restatement (Second) of Agency § 220.

Many Courts of Appeals have been confronted with problems similar to those in *Baker* and *Ward*, and they too have taken a nontechnical approach based on the various aspects of the particular case presented. For example, in *Missouri K–T R. Co.* v. *Hearson*, 422 F. 2d 1037 (CA10 1970), the injured worker was a car cleaner. The railroad had stopped doing its own car cleaning and had hired a firm to do the job, and the injured worker was nominally the employee of this hired firm. But, upon examining all the factors, the Court of Appeals affirmed

336

the District Court ruling that reasonable men could not differ in the conclusion that the victim was in an employment relationship with the railroad for FELA purposes. In *Schroeder* v. *Pennsylvania R. Co.*, 397 F. 2d 452 (CA7 1968), the deceased worker was nominally an employee of a trucking company which was under contract to perform certain pickup and delivery services for the railroad. Considering all the facts the Court of Appeals held that the trial judge had properly submitted to the jury the question of whether the deceased had been employed by the railroad for FELA purposes. Many more cases of a similar nature exist. See, *e. g., Byrne* v. *Pennsylvania R. Co.*, 262 F. 2d 906 (CA3 1958); *Cimorelli* v. *New York Central R. Co.*, 148 F. 2d 575 (CA6 1945). But see, *e. g., Fawcett* v. *Missouri Pacific R. Co.*, 242 F. Supp. 675 (WD La. 1963), aff'd, 347 F. 2d 233 (CA5 1965).

The case most clearly in point from another Court of Appeals is *Smith* v. *Norfolk & Western R. Co.*, 407 F. 2d 501 (CA4 1969). There the injured worker was also employed by a company which unloaded autos from railroad cars, and, like the petitioner here, the worker fell to the ground from the top tier of one of the cars. The District Court granted the worker summary judgment, since it had no doubt that he was an employee of the railroad within the meaning of the FELA. The Court of Appeals affirmed, using the following language: "Though employees of independent contractors are not accorded coverage under the Act . . . if the injured worker is employed by an agent or adjunct of the railroad he will be treated as an employee of the railroad for purposes of the Act. . . . Thus traditional concepts of agency extend the coverage of the Act." *Id.*, at 502. The District Court in this case relied on the language of the Court of Appeals in *Smith* v. *Norfolk & Western R. Co., supra.* The Court today holds that this language misstates the law.

All servants [1] are agents of their masters. Restatement (Second) of Agency § 2 (2). But many agents are not servants within the meaning of § 220 of the Restatement. For example, an agent may be an independent contractor, but an independent contractor may never be a servant. *Id.* § 14 N, comment *a.* In *Baker* and *Ward* we referred to the Restatement as a source of principles which provide a basis for the factual decision as to whether an individual is an employee for FELA purposes. Under those principles an employee must be a servant and not merely an agent.[2]

Because the District Court in the present case used the word "agent" rather than "servant" or "employee" it committed a technical error. But our inquiry here should not be limited to a narrow examination of whether the right form of words was used to support a judgment in favor of a seriously injured worker. The District Court found that the requisite relationship was present to permit a recovery under the FELA, and we should ask whether the findings of fact that were made were sufficient to support that conclusion under the legal standard as correctly described.

The District Court made numerous findings of fact which support its conclusion that the FELA is applicable here, and these findings have not been held to be "clearly erroneous" under Fed. Rule Civ. Proc. 52 (a). Petitioner had been working in the job of unloading automobiles from respondent's railroad cars for eight years. Restatement (Second) of Agency §§ 220 (2)(f), 227,

---

[1] The term "servant" as used in the Restatement expresses the same concept that "employee" does within the meaning of the FELA. Restatement (Second) of Agency § 220, comment *g.*

[2] Support for this point is found in the fact that, as noted by the Court of Appeals below, Congress once rejected a proposal that suppliers of accessorial services to railroads be included under the FELA. See S. Rep. No. 661, 76th Cong., 1st Sess., 2 (1939).

comment *c*. The work performed was that of respondent, to be performed in the general course of respondent's business pursuant to its contractual responsibilities. *Id.* § 220 (2)(h). The work was of an unskilled variety. *Id.* §§ 220 (2)(d), 227, comment *c*. Petitioner was paid by the hour. *Id.* § 220 (2)(g). The record was unclear as to who supplied the necessary hammers and wrenches, but respondent clearly supplied the necessary ramps and working area, and it was responsible for safety. *Id.* § 220 (2)(e). Respondent had the immediate responsibility for supervision and control of the work, though this task was carried out by others who, like petitioner, were servants of Pacific Motor Trucking Co. *Id.* § 220 (2)(a).[3]

There are basically two reasons for the Court of Appeals' reversal of the District Court's holding in peti-

---

[3] The value of examining multiple factors such as these is that it permits the analyst to avoid reliance on abstract inquiries as to kinds and degrees of control. Some factors—such as who is responsible for supervision, whose work is being performed, and who supplies the tools and place of work—are of obvious relevance. Other factors, though perhaps of less weight, are also helpful. For example, the skill of the worker and the manner in which he is paid are relevant to the ease with which control over him may be shifted from one master to another. And the length of time that the nominal servant of one master has been aiding in the business of another is likewise indicative of a shift in control.

Section 220 (2) of the Restatement provides a number of factors which it states should be considered "among others." Another factor which might be considered in this case is that Pacific Motor Trucking Co. is a wholly owned subsidiary of respondent. The Court of Appeals noted that no case has been made for piercing the corporate veil and thus disregarding the fact that the railroad and the trucking company are separate entities. Indeed, petitioner does not urge that we do so. Brief for Petitioner 6 n. 3. If the corporate veil were to be pierced that would presumably end the inquiry, an inappropriate result on this record. Nevertheless, it seems reasonable to take into account as one of many factors the relationship between the trucking company and the respondent.

tioner's favor. First, the District Court found that petitioner was an employee of the trucking company. But this does not mean that petitioner was not also an employee of the railroad for the purposes of the FELA. In *Byrne* v. *Pennsylvania R. Co.*, 262 F. 2d, at 910; the victim was an employee of Westinghouse who was working on a railroad locomotive at the time of his death. The Court of Appeals noted in that case that "[t]here is, of course, no question but that [the victim] was an employee of Westinghouse. The issue is whether sufficient evidence was adduced to enable the jury to conclude that [the victim] was also an employee of the Railroad." See Restatement (Second) of Agency §§ 226 and 227. If the mere fact that an individual is on the payroll of someone other than the railroad sufficed to make that individual not an employee of the railroad for FELA purposes, then this Court would not have found it necessary to reverse in the *Baker* case.. Such a simple test could be devised, but whether such a change in the law is to be made should be up to Congress to decide.

The second reason the Court of Appeals used for reversing the District Court was that the District Court had rejected a finding that petitioner was an employee of the railroad. The trial judge was relying on the "agency" language of *Smith* v. *Norfolk & Western R. Co., supra,* and he therefore apparently had his labels confused. He was using the concept of employment in a narrow and restricted way, yet was expanding it to accommodate decisions such as *Baker* by including both employment and agency relationships within the scope of the FELA. If the District Judge did not find an employment relationship in this narrow sense, that fact is unimportant, for he did find a relationship sufficient to satisfy the correct test. While he used language of agency he gave that language the substantive content

of *Baker* and of the source relied upon by *Baker*—Restatement (Second) of Agency § 220. He made findings of fact easily sufficient to support the existence of an employment relationship under the correct substantive test, and he in fact found that the requisite relationship existed. The fact that he used the word "agency" rather than the word "employment" to describe this relationship is thus of no more than technical, abstract concern. This is not the sort of concern that should motivate us in the FELA context.

The majority here has taken a different tack from that of the Court of Appeals. Citing numerous cases from the era before the 1939 amendments to the Act, the majority argues that the railroad here exercised insufficient control over the petitioner to establish the requisite employment relationship. Under the approach taken in *Baker* and *Ward,* however, the existence of a master-servant relationship is to be determined from an examination of many factors. This is quite different from the majority's concentration on technical distinctions regarding kinds and degrees of control and cooperation.[4] As I have indicated, I think that a judgment in favor of the petitioner is quite justified on the basis of facts already found by the District Court. I have no strong objection to the decision that the case be remanded for new findings in light of the correctly stated legal standard, but I dissent from the rigid and old-fashioned standard of liability which the majority indicates should be made applicable.

In a strictly doctrinal sense this case may not have a great impact on the coverage of the FELA, but I fear

---

[4] The majority relies on two modern cases, *Baker* v. *Texas & Pacific R. Co.,* 359 U. S. 227 (1959), and *Shenker* v. *Baltimore & Ohio R. Co.,* 374 U. S. 1 (1963). But there is nothing in these cases to indicate that technical distinctions between control and cooperation are the only subjects of investigation in considering whether a master-servant relationship exists under the FELA.

that the precedent set today bodes ill for the future. It distorts the accepted meaning of the Act and reflects a judicial hostility to the FELA of the kind that existed prior to the 1939 amendments.

I would reverse the judgment below.

MR. JUSTICE BLACKMUN, dissenting.

The Court in its decided cases has traveled far in order to accord Federal Employers' Liability Act coverage to a variety of employment situations. See, *e. g.*, *Shenker* v. *Baltimore & Ohio R. Co.*, 374 U. S. 1, 5 (1963), and *North Carolina R. Co.* v. *Zachary*, 232 U. S. 248, 260 (1914). Its many decisions are now a well-chalked slate that should not be significantly erased without good reasons. Neither should the Court change a mature and highly developed legal standard, long accepted by Congress, without explaining those reasons or even saying what the effect will be.

For me, the Court's *per curiam* opinion in *Baker* v. *Texas & Pacific R. Co.*, 359 U. S. 227 (1959), controls this case. There the injured workman had been hired by a corporation engaged in work along the railroad's main-line right-of-way. The work consisted of pumping sand and cement into the roadbed in order to strengthen and stabilize it. The workman was struck by a train while engaged at this job. The petitioners contended that he was killed while he was "employed" by the railroad, within the meaning of the Act. Evidence on the question was introduced, but the trial judge declined to submit the issue to the jury, holding as a matter of law that the workman was not in such a relationship to the railroad at the time of his death as to entitle him to the Act's protection. The state courts refused to disturb the judgment for the railroad.

This Court, however, held that the Act does not use the terms "employee" and "employed" in any special

sense, and that the familiar general legal problems as to whose employee or servant a worker is at a given time present themselves as matters of federal law under the Act.   Each case, the Court said, must be decided on its peculiar facts and " 'ordinarily no one feature of the relationship is determinative.' "   The Court concluded that it was "perfectly plain" that the question "contains factual elements such as to make it one for the jury under appropriate instructions as to the various relevant factors under law."   *Id.*, at 228.   It pointed out that the petitioners introduced evidence tending to prove that the work "was part of the maintenance task of the railroad"; that the road "furnished the material to be pumped into the roadbed"; and that a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercised directive control over the details of the job. *Ibid.*   The railroad introduced evidence tending to controvert this.   The Court then held that an issue for determination by the jury was presented.

So it is here.   Kelley was injured at the railroad's loading-and-unloading ramp in San Francisco.   He and others were unchaining new automobiles for unloading when he fell from the third level of the railroad car.   He was hired, paid by, and could be discharged by the railroad's wholly owned subsidiary.   All the officers and directors of that subsidiary were officers or directors of the railroad.   The subsidiary was the only company then having a contract with the railroad to unload cars at that ramp.   Kelley had been employed at this particular job and at this site for eight years and was paid on an hourly basis.   The unloading was the railroad's responsibility pursuant to its contractual obligation to its shipper.   The railroad supplied the necessary working area.   The work performed by Kelley was unskilled.   Railroad employees had the responsibility daily to check the safety of the cars and to make necessary repairs.   There was evidence

that the railroad exercised a degree of control over the unloading operation and that PMT employees performing this work frequently felt they had to heed the railroad supervisor's command.*

All this, it seems to me, is enough to create an issue for the trier of fact, just as the *Baker* case illustrates and as it teaches. The trier could find that Kelley was doing work of a kind and in a way and under such supervision of the Southern Pacific as made him an employee of that railroad for purposes of the FELA.

I feel the Court, *ante,* at 325 n. 6, gives undue emphasis to the District Court's treatment of findings of fact proposed by the petitioner. Every actively practicing trial attorney knows that some judges readily adopt findings presented by counsel; that other judges almost always reject proposed findings and prefer to draft their own or have their clerks prepare them; and that still others adopt a middle course. In this case the District Court produced a judgment for the injured workman. I doubt whether there can be much significance in the adjustment-of-proposed-findings route by which that judgment was reached.

While the Court disclaims any modification of the standards for allowing questions of fact in FELA cases to go to the jury, its decision here suggests otherwise. The Court implies that supervision must be "day-to-day" in order to constitute "supervision" for purposes of creating "employee" status under the FELA. *Ante,* at 331. Does this mean that orders must be issued with a certain frequency (*e. g.,* every day, or most days) or merely in a certain manner (*e. g.,* the "daily" normal "course of the work," *Baker,* 359 U. S., at 228–229)? The

---

*There was testimony by PMT employees that in practice they took instructions and directions from Southern Pacific supervisors, and that failing to follow them could jeopardize their jobs. *E. g.,* App. 57.

Court does not say. I suspect that trial judges will be inclined to resolve most doubts against plaintiffs if their findings are to be so vulnerable to challenge.

I also fear that the Court's holding may be one that opens the way for the railroads of this country to avoid FELA liability. That way apparently is to contract out large portions of maintenance and loading and unloading responsibilities that normally are part of the railroad's operation.

I would reverse the judgment of the Court of Appeals, and I therefore dissent.