2019 IL App (1st) 181474

SIXTH DIVISION
May 24, 2019

No. 1-18-1474

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| ERIC ATLAS, | ) Appeal from the Circuit Court |
| | ) of Cook County. |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) No. 16 L 1123 |
| | ) |
| UNION PACIFIC RAILROAD COMPANY, | ) |
| | ) Honorable Allen Price Walker, |
| Defendant-Appellee. | ) Judge Presiding. |

---

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Eric Atlas brought this lawsuit against Union Pacific Railroad Company (Union Pacific). One count was a claim under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2012)), and one count alleged common law negligence. The parties filed cross-motions for summary judgment. The circuit court granted Union Pacific's motion and denied Atlas's. Because no genuine issue of fact exists as to whether Atlas was an employee of Union Pacific for FELA purposes, and because Atlas failed to raise a genuine issue of material fact as to Union Pacific's duty of care, we affirm.

¶ 2                            I. BACKGROUND

¶ 3     The pleadings, admissions, and affidavits to the cross-motions for summary judgment establish the following facts. Union Pacific is a railroad company that owns and operates facilities in the Chicago area, including an intermodal facility called Global II.[1] Union Pacific entered into a contract with Mobile Rail Solutions, Inc. (MRS), under which MRS would service Union Pacific locomotives on an "as needed" basis for a flat fee. MRS would service the locomotives by checking and adding cooling water, checking and adding engine lubrication oil, dumping and recharging locomotive toilets, cleaning retention bins, draining and disposing the contents of retention tanks, cleaning locomotive cabs and windows, supplying cabs with crew packs, and checking and adding tractive sand. The contract required that MRS provide the service trucks, superintendence, labor, tools, equipment, and materials required to service the locomotives. Union Pacific, for its part, agreed to provide the engine cooling water, lubrication oil, crew packs, drinking water, and sand.

¶ 4     MRS agreed to "take [Union Pacific's] training program and abide by all Union Pacific safety requirements including clothing, flagging, spill prevention, etc." Additionally, MRS was to be "solely responsible for safety of, and *** provide protection to prevent damage, injury, or loss, to all persons who would reasonably be expected to be affected by the Work." The contract explicitly stated that neither MRS nor its agents and employees were to be considered employees of Union Pacific. MRS was to remain an "independent contractor."

¶ 5     Atlas applied for employment with MRS and was hired by MRS. MRS paid Atlas $17 per hour, plus overtime, to service locomotives at intermodal facilities owned by Union Pacific and

---

[1]The Global II facility is physically attached to another facility, known as Proviso Yards. The names are occasionally used interchangeably in the record. For our purposes, there is no particular significance to the distinction between Global II and Proviso Yards. Therefore, we simply refer to Global II.

CSX (a competing railroad). MRS checked Atlas's driving record and administered a driving responsibility test. MRS also trained Atlas in topics such as locomotive service operations, locomotive servicing standards, and safely transferring septic from locomotive to truck. MRS had the exclusive authority to discipline or fire him.

¶ 6    MRS provided Atlas with a tablet computer and a cellular telephone. It also issued personal protection equipment, including a safety vest, helmet, safety glasses, work gloves, ear plugs, and a plastic face shield. If that personal protection equipment wore out, Union Pacific would supply replacement equipment on site. MRS gave Atlas his work schedule and assigned him to various intermodal rail facilities owned by Union Pacific or CSX.

¶ 7    During the relevant timeframe, Union Pacific began to transition away from using independent contractors to service locomotives at Global II. Union Pacific started providing trucks and Union Pacific employees to service locomotives. Occasionally, MRS employees and Union Pacific employees, each using their respective company trucks, would service connected locomotives at the same time.

¶ 8    One day, Atlas arrived at work at the Global II facility. He clocked in using his MRS tablet and did a pre-check on the MRS truck he used to service the locomotives. He then went to the Union Pacific office, where the foreman general of the facility, a Union Pacific employee, gave him a list of locomotives that needed to be serviced. Neither the foreman general nor any other Union Pacific employee directly supervised Atlas as he went about servicing the listed locomotives. Working alone, Atlas drove the MRS truck to a locomotive. He flagged the locomotive and the track, before and behind. Atlas cleaned the locomotive's cab and bathroom. He then got off of the locomotive and connected the septic hose from the MRS truck to the locomotive's toilet drain pipe. After the septic tank was finished draining, Atlas attempted to

disconnect the hose from the drain pipe and found that it was stuck. At the time, he was standing on an incline, on the "big, red rocks" along the tracks known as "ballast." With both hands, he "tried to pull on it and pull on it," but it would not come off. Eventually, he "really had to plant [his] feet and yank it." As the hose broke free, Atlas felt a sharp pain in his neck and "went back a step or two. [He] never fell."

¶ 9     After removing the hose, Atlas observed "shiny" or "fresh" metal in the groove on the drain pipe into which cams on the hose coupler would latch. He had not seen that shiny or fresh metal before he put the hose on. Atlas did not notify anyone about the drain pipe incident, and continued working.

¶ 10     That same evening, Atlas accidentally cut his arm on a piece of fiberglass. He cleaned the cut, put a bandage on it, and continued working. When he finished his shift, he went home. The next day, Atlas again worked a shift at Global II. He did not notify anyone about the drain pipe incident. The second day after the incident, Atlas again reported for work at Global II. However, he did not complete his shift because he wanted a medical professional to examine the cut on his arm. He told the Union Pacific foreman general about cutting his arm, but not about the drain pipe. Atlas then called his MRS supervisor and told him about cutting his arm, but not about the drain pipe. The MRS supervisor took Atlas to the hospital.

¶ 11     The parties filed cross-motions for summary judgment. In support of his motion, Atlas attached the affidavit of Jeffrey Miller, an MRS supervisor. Miller's affidavit stated that: Union Pacific assigned locomotives to be serviced, Atlas and other MRS workers reported to the Union Pacific mechanic in charge, Union Pacific provided training for MRS workers, Union Pacific provided trucks to do the work, and Atlas's role was to take orders from Union Pacific supervisors and do the work that they assigned.

¶ 12    Atlas also relied on a mechanical expert, who concluded, based on Atlas's testimony, that the toilet drain pipe was damaged such that it prevented the hose from properly disconnecting. It was his opinion that the shiny or fresh metal in the groove on the drain pipe was the "condition" that caused the dysfunction. He opined that Union Pacific failed to properly inspect and maintain the drain pipe to make sure that it was safe. He also testified, however, that he never saw shiny or fresh metal in the groove of a toilet drain pipe. Additionally, he testified that he would expect a hose to properly disconnect from a drain pipe with shiny or fresh metal in the groove. He could not explain how such a condition would cause a hose to become stuck.

¶ 13    The circuit court granted Union Pacific's motion and denied Atlas's. The court found that Atlas failed to raise a genuine issue of material fact that he was an employee of Union Pacific for the purposes of FELA. The court also found that Atlas had not raised a genuine issue of material fact as to whether his injury was sufficiently foreseeable to sustain a negligence claim. Specifically, Atlas had not presented evidence that Union Pacific had actual or constructive notice of the alleged defect in the drain pipe.

¶ 14    This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    Atlas contends that he raised a genuine issue of material fact as to whether he was an employee of Union Pacific for the purposes of FELA. He also argues that the circuit court erred in granting judgment on his common law negligence claim. We disagree.

¶ 17    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Summary judgment should only be granted when the moving party's right to judgment is

"clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Id.* at 131-32. If reasonable people would draw divergent inferences from undisputed facts, summary judgment must be denied. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 18    However, "[s]tatements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact." *Outboard Marine*, 154 Ill. 2d at 132. Moreover, "summary judgment requires the responding party to come forward with the evidence that it has—it is the put up or shut up moment in a lawsuit." (Internal quotation marks omitted.) *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14. We review the circuit court's decision on a motion for summary judgment *de novo*. *Id.*

¶ 19    Generally, a FELA action brought in state court is governed by state procedural law and federal substantive law. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002) (citing *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409 (1985)). "With respect to the interpretation of federal law, we are bound only by the decisions of the United States Supreme Court and the Illinois Supreme Court, not by the decisions of the lower federal courts." *Ammons v. Canadian National Ry. Co.*, 2018 IL App (1st) 172648, ¶ 20. However, uniformity is an important consideration, and we view the interpretation of federal law by federal courts with deference. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 35.

¶ 20    In order to establish a cause of action under FELA, a plaintiff must prove that (1) defendant is a common carrier, (2) plaintiff was an employee of the common carrier, (3) plaintiff's injury was sustained while employed by the common carrier, and (4) defendant's negligence is the cause of the injuries. 45 U.S.C. § 51 (2012).

¶ 21    An employee of a non-FELA entity may, however, recover from a railroad defendant under the statute under if (1) the plaintiff is a borrowed servant of the railroad, (2) the plaintiff works for two employers (one of which is the railroad) simultaneously, or (3) the plaintiff's employer is a servant of the railroad, making the plaintiff is a "subservant" of the railroad. *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 324 (1974). "When the plaintiff fails to present evidence to create a genuine issue of material fact on the question of his employment by the defendant for FELA purposes, summary judgment for the defendant is proper." *Larson v. CSX Transportation, Inc.*, 359 Ill. App. 3d 830, 834 (2005).

¶ 22    Atlas concedes that he was nominally an employee of MRS, which is not a party to this appeal and is not a common carrier for FELA purposes. However, he contends that he presented sufficient evidence to reach the jury on each of the possible alternative theories of recovery listed in *Kelley*. We disagree.

¶ 23    In his complaint, Atlas alleged, as alternatives, that he "was serving as the borrowed servant of the railroad; or he was the joint employee of the railroad and [MRS]; or he was the subservant of [MRS] that was the servant of the railroad." However, he did not explicitly argue any of these individual theories before the circuit court. In his cross-motion/response brief, Atlas relied on *Kelley* and *Schmidt v. Burlington Northern & Santa Fe Ry. Co.*, 605 F.3d 686 (9th Cir. 2010), both of which are subservant cases. In granting summary judgment for Union Pacific, the circuit court concluded that Atlas was pursuing the subservant theory rather than the other

theories. Consequently, Union Pacific argues that the other theories are waived. See *Killion v. Meeks*, 333 Ill. App. 3d 1188, 1190 (2002) (arguments not raised before the trial court are waived). We agree; having failed to raise those arguments in its briefs on the cross-motions, Atlas may not raise them now.

¶ 24    Even if these alternative arguments were not waived for failure to raise them before the circuit court, they are forfeited because Atlas has made no substantive arguments on those points before this court. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) governs the requirements for appellants' briefs. With respect to arguments, the rule states that the briefs shall contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." An argument that contains merely vague allegations may be insufficient if it does not include citations to authority. See, *e.g.*, *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493 (2002) (three-paragraph argument was insufficient to satisfy Rule 341 where argument did not include any citations to authority). Although Atlas argues that a genuine issue of material fact exists as to his employment status under all three theories, his brief skips from the recitation of the three theories by the *Kelley* court to an analysis of the subservant theory. Ironically, he primarily relies on *Schmidt*, a case in which the court only addressed the subservant theory because it found that the other theories were waived. *Schmidt*, 605 F.3d at 689.[2]

---

[2]As explained below, Atlas failed to raise a genuine issue as to whether he was a subservant of Union Pacific. Even if we reached the merits of the borrowed servant or dual employee theories, we would find that Atlas failed to raise a genuine issue as to his employment. As Atlas correctly notes in his reply brief, the inquiry on each theory focuses on the issue of control, so the evidence necessary to support one theory is often the same evidence required to support the others. See *Larson*, 359 Ill. App. 3d at 838 ("Having concluded that Larson has presented insufficient evidence of CSXT control over his work to require the submission of his status as a borrowed or dual servant of the railroad to the jury, we also conclude that the same evidence fails to create a jury question regarding Larson's claim that FGE was the railroad's servant.").

¶ 25 Under the subservant theory, a plaintiff must show that his employer was the common-law servant of the defendant railroad, such that the railroad controlled or had the right to control the employer's daily operations. *Id.* at 690. A plaintiff must also show that he was " 'employed to perform services in the affairs of [the defendant railroad] and *** with respect to the physical conduct in the performance of the services [was] subject to [that railroad's] control or right to control.' " *Id.* (quoting *Kelley*, 419 U.S. at 324). It is not enough for Atlas to merely show that MRS was the railroad's agent, or that he was acting to fulfill the railroad's obligations. Union Pacific's generalized oversight of Atlas, without physical control or the right to exercise physical control of his daily work, is insufficient. See *Kelley*, 419 U.S. at 325-26.

¶ 26 Atlas argues that we should follow *Schmidt* in finding that he raised a genuine issue of material fact as to whether he was a subservant of Union Pacific. In *Schmidt*, the plaintiff applied for employment with the defendant railroad, but was ultimately hired by a subsidiary of the railroad. *Schmidt*, 605 F.3d at 688. When he was hired, he was told by a supervisor that he was a railroad employee, and some of his coworkers believed that they were also railroad employees. *Id.* Workers, including Schmidt's supervisors, wore railroad logos on their work clothing. *Id.* The railroad provided the plaintiff work gloves and vouchers for boots. *Id.* Railroad safety policy required the plaintiff to use specific safety gear. *Id.* The plaintiff was required to participate in its safety and job skills training along with railroad employees. *Id.* at 690. It was the railroad's own medical officer who determined that the plaintiff was unable to return to work. *Id.* at 691. The railroad, not Schmidt's nominal employer, paid his wages. *Id.* Documents from railroad management referred to Schmidt as a railroad employee and treated him as subject to its control. *Id.* The *Schmidt* court agreed with the defendant railroad that there was "scant" evidence that the

railroad exercised control over the plaintiff's work, but concluded that there remained a genuine issue of material fact. *Id.*

¶ 27    The facts of this case are very different from those in *Schmidt*, and we agree with the circuit court that there is no genuine issue of fact as to whether Atlas was a subservant of Union Pacific. The nominal employer in *Schmidt* was a subsidiary, not an independent contractor like MRS. In fact, Atlas occasionally also serviced CSX locomotives at a CSX facility on behalf of MRS. The contract between MRS and Union Pacific expressly states that "[MRS] and the agents and employees of [MRS] are not and shall not be considered as employees of [Union Pacific]." And, unlike in *Schmidt*, it was the sole responsibility of MRS to hire, train, discipline, and terminate MRS employees, including Atlas. See also *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 673 (6th Cir. 2010) (listing those particular tasks as "crucial areas" evaluating a subservant claim). There is no evidence that MRS employees or supervisors ever wore Union Pacific logos. MRS provided Atlas with a truck and other tools to perform his job, as well as his personal protective equipment. And when Atlas first complained of an on-the-job injury, it was an MRS supervisor, not a Union Pacific employee, who took him to the hospital.

¶ 28    Atlas contends that his case is similar to *Schmidt* because MRS employees were required to abide by Union Pacific safety guidelines, and because Union Pacific would replace worn-out MRS protective equipment on site. But that does not show the sort of control contemplated under the subservant theory of liability. "The agreement to abide by certain safety regulations is a reasonable request necessary to safeguard against dangerous work and does not constitute control or supervision." *Royal v. Missouri & Northern Arkansas R.R. Co.*, 857 F.3d 759, 763 (8th Cir. 2017).

¶ 29    Atlas contends that Union Pacific instructed MRS and Atlas on which locomotives to service and the order in which to service them. It is undisputed, however, that Atlas would receive a list of locomotives that needed to be serviced and then set about his job alone, without any direct supervision from the railroad. That level of contact indicates nothing more than the necessary coordination of a complex railroad operation. See *Kelley*, 419 U.S. at 330 ("the evidence of contacts between [railroad] employees and [contractor] employees may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation"); *Campbell*, 600 F.3d at 669, 673 (holding that, although railroad's hub manager admittedly oversaw contractor's work to ensure timely completion and safety compliance, "discussions" about which tracks needed to be cleared and spotted were not sufficient to establish control). This minimal interaction between Atlas and the Union Pacific foreman general is in sharp contrast to cases such as *Baker v. Texas & Pacific Ry. Co.*, 359 U.S. 227, 228-29 (1959) (*per curiam*), where

> "a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture."

¶ 30    Atlas argues that the affidavit of Jeffrey Miller raises a genuine issue of material fact as to Atlas's employment. The circuit court, quoting *Kelley*, 419 U.S. at 330, concluded that

> "Miller's affidavit simply states in conclusory fashion that: [Union Pacific] assigned locomotives to be serviced by plaintiff, plaintiff and other MRS workers reported to the [Union Pacific] mechanic in charge, [Union Pacific] provided training for MRS workers, [Union Pacific] provided trucks to do the work, and that plaintiff's role at [Union Pacific]

was to take orders from the [Union Pacific] supervisors and to perform work that the [Union Pacific] supervisors assigned. These actions amount to no more than the 'passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation.' "

We agree. Miller's affidavit is conclusory as to the relationship between MRS employees, including Atlas, and Union Pacific, and the conditions described in the affidavit so vague that they do not contradict Union Pacific's position that MRS and its employees were independent contractors. For example, the assertion that Union Pacific provided trucks does not tend to prove Atlas's claim because the record shows that MRS employees used MRS trucks while Union Pacific employees performed similar work using Union Pacific trucks. Likewise, the fact that Atlas was tasked with "perform[ing] the work the [Union Pacific] supervisors assigned" is totally consistent with the contract language that MRS, as an independent contractor, was to service locomotives for Union Pacific "as needed."

¶ 31    If the evidence of railroad control in *Schmidt* was "scant," the evidence here is virtually nonexistent, and certainly insufficient to raise a genuine issue of material fact as to whether Atlas was an employee of Union Pacific for the purposes of FELA. We affirm the judgment on that count of the complaint.

¶ 32    Atlas also argues that the circuit court erred in entering judgment in favor of Union Pacific on his common law negligence claim. His argument on this point is somewhat underdeveloped because, he claims, the circuit court granted summary judgment without considering this claim. However, the court's order specifically states that Atlas "failed to present sufficient evidence to support his negligence claim, namely, that [Union Pacific] had either actual or constructive notice of the defective condition of the toilet drain pipe."

¶ 33    To succeed on a claim of negligence, a plaintiff must first establish that the defendant owes him a duty of care. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 14. The existence of such a duty is a question of law, and therefore properly determined on a motion for summary judgment. *Id.* "The first factor we look to in determining whether a duty of care existed in this situation is whether the risk of harm to the plaintiff was reasonably foreseeable. *** If the injury was not reasonably foreseeable, no duty can exist." *Id.* ¶ 24.

¶ 34    Atlas argues that there can be no doubt that Union Pacific owed him a duty of ordinary care because he was a business invitee on Union Pacific property at the time of his injury and because federal regulations require that railroad companies inspect locomotives that are in use. However, duties of care are not absolute. "[L]iability under the rules of ordinary negligence requires some knowledge on the part of the defendant, actual or constructive, of the possibility of the danger complained of." *Prater v. Veach*, 35 Ill. App. 2d 61, 65 (1962). In *Prater*, a small child was electrocuted when she touched the defendant's air conditioning unit. *Id.* at 63. Because the defendant had permitted the child to play in his yard, he owed her, as his invitee, a duty to exercise reasonable care to make a natural or artificial condition on his premises reasonably safe, but only if he had actual or constructive knowledge of the condition. *Id.* at 64-65. The court found that the defendant could not have foreseen the injury because he had no reason to suspect that the air conditioner was improperly installed. *Id.* Because the injury was not reasonably foreseeable, the defendant had no duty to protect the child from it. *Id.*

¶ 35    Atlas claims that Union Pacific owed him a duty of care to prevent his being injured due to the presence of shiny or fresh metal in the groove of the locomotive's toilet drain pipe. However, he has not produced any evidence to show that Union Pacific had actual or constructive knowledge of any defect with the toilet drain pipe, or that the presence of shiny or

fresh metal in the groove of the drain pipe created a dangerous condition. He testified that he attached the hose to the pipe as usual, without any problem. He only noticed the shiny or fresh metal in the groove on the pipe after he had yanked the hose free. There is no evidence that the metal was like that before Atlas attached the hose, much less that knowledge of the shiny or fresh metal would have indicated that there was some dangerous defect with the pipe. In fact, Atlas's mechanical engineer testified that he would not expect shiny or fresh metal to prevent the hose from disconnecting properly, and he was unable to explain how it might cause the hose to become stuck. So, assuming Union Pacific had a duty to inspect all of its locomotives' toilet drain pipes, Atlas has presented no evidence that such an inspection would have made his injury reasonably foreseeable.

¶ 36     Because Atlas presented no evidence that his injury was reasonably foreseeable by Union Pacific, the circuit court did not err in granting summary judgment to Union Pacific on his negligence claim.

¶ 37     We note that in his reply brief, Atlas contends that Union Pacific had a duty to maintain safe walkways at Global II. No such contention appears in his opening brief. Points that an appellant fails to raise in his opening brief are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). This argument is therefore forfeited.

¶ 38                                III. CONCLUSION

¶ 39     The circuit court did not err in granting Union Pacific's motion for summary judgment on both Atlas's FELA and common law negligence claims. Accordingly, we affirm the court's judgment.

¶ 40     Affirmed.