RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MICHAEL CAMPBELL,

　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

No. 09-5614

BNSF RAILWAY COMPANY f/k/a THE
BURLINGTON NORTHERN & SANTA FE
RAILWAY COMPANY,

　　　　　　　*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 07-02286—Jon Phipps McCalla, Chief District Judge.

Argued: March 3, 2010

Decided and Filed: April 9, 2010

Before: KEITH, CLAY, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** David G. Mills, MILLS & ASSOCIATES, Cordova, Tennessee, for
Appellant. Kenneth O. Cooper, DOMICO KYLE, PLLC, Memphis, Tennessee, for
Appellee. **ON BRIEF:** David G. Mills, MILLS & ASSOCIATES, Cordova, Tennessee,
for Appellant. Kenneth O. Cooper, Jessica M. Hackett, DOMICO KYLE, PLLC,
Memphis, Tennessee, for Appellee.

———————————

## OPINION

———————————

　　GRIFFIN, Circuit Judge. While employed by Pacific Rail Services, LLC
("PRS"), plaintiff Michael Campbell was injured when the railroad transport vehicle he
was driving was rear-ended at a rail yard owned by defendant BNSF Railway Company
f/k/a The Burlington Northern & Santa Fe Railway Company ("BNSF"). In this

negligence action, Campbell alleges that he was an "employee" of BNSF for purposes of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* The district court disagreed and granted BNSF's motion for summary judgment, holding that there was no master-servant relationship between BNSF and PRS or between BNSF and Campbell. In this appeal, Campbell challenges that ruling and two others: the district court's grant of summary judgment to BNSF on Campbell's claim that the agreement between BNSF and PRS was designed to circumvent FELA, contrary to 45 U.S.C. § 55, and its denial of Campbell's request to amend his complaint to add a claim for civil conspiracy based upon its determination that the statute of limitations had run. For the reasons that follow, we affirm the judgment of the district court.

I.

PRS operates intermodal rail facilities for railroad companies throughout the United States.[1] On May 1, 2003, PRS entered into a three-year Intermodal Facility Services Agreement ("Intermodal Agreement") with BNSF at BNSF's terminal in Memphis, Tennessee. The Intermodal Agreement required PRS to do the following: load and unload BNSF's railcars; transport trailers, containers, and chassis;[2] stack chassis; inspect, monitor, direct, and track equipment, shipments, and personnel passing through the terminal's checkpoint; manage and reconcile inventory; oversee the container yard; ensure the proper securement and documentation of hitches, container locking devices, and railroad tracks; and operate the lights, pole gates, and derails.

In fulfilling its duties, PRS had to "provide the necessary supervisors and support personnel to ensure the facilities run Safely, Efficiently and Effectively" for up to 24 hours per day, seven days a week. Regarding PRS's hiring decisions, the Intermodal Agreement prohibited unlawful discrimination, required PRS to perform background checks, and forbade PRS from assigning to the terminal any employee who had been convicted of various crimes or who was not a citizen of, or not lawfully permitted to

---

[1] "Intermodal" operations are those involving "the loading and unloading of trailers and containers onto railcars."

[2] A chassis is a structural frame supporting containers and boxes and pulled by a tractor.

work in, the United States. PRS also had to appoint employees to particular managerial and supervisory positions and, with BNSF's approval, could allocate additional personnel to them at agreed upon compensation rates. To meet its staffing obligations, PRS assigned approximately 140 of its employees to the terminal. Regarding the status of PRS's employees, the Intermodal Agreement provided:

> It is the intention of Railroad Company and Contractor that Contractor shall at all times be and operate as an independent contractor to Railroad Company and nothing herein contained shall be construed as inconsistent with that status. Contractor shall employ, direct, and supervise all persons performing any service hereunder, and such persons shall be and remain the sole employees of and subject to the control, direction, and supervision of Contractor, and not the employees of nor subject to direction, control, and supervision of Railroad Company.

In contrast to PRS's 140 employees, BNSF employed a single worker at the terminal, Andrew Scott Jenkins, who was BNSF's hub manager. Jenkins was charged with observing PRS workers to insure their timely completion of work and adherence to BNSF's safety protocols. Although Jenkins had "discussions" with PRS about which tracks needed to be cleared and spotted, PRS managers and supervisors were responsible for directing their employees in the specifics of their jobs, assigning containers to rail cars, and coordinating and tracking the work. Jenkins also had no authority to hire, fire, discipline, train, evaluate, or supervise PRS employees; those responsibilities were left to PRS's terminal and ramp managers, who held regular safety meetings for PRS workers and maintained exclusive control over their work schedules. PRS employees wore hard hats and safety vests bearing the PRS logo, were not members of the same union as BNSF employees, and did not participate in railroad retirement plans.

Assisting PRS workers were BNSF's computers and its real-time software program, OASIS. Only PRS could input information into OASIS; BNSF was limited to viewing the data entered.

The primary equipment PRS used to perform its work were 32 or 33 hostlers.[3] Each hostler cost $60,000 new and $20,000 used. PRS also owned eight pick-up trucks and provided all radio equipment.

BNSF, on the other hand, owned four overhead cranes, two side cranes, and two side chassis cranes. Each crane cost approximately $1.5 million. BNSF also furnished office, maintenance, and repair space for PRS, and it provided a phone system, a copy machine, and most of the office desks. PRS had its own fax machine, paid for its internet service provider, and owned some of the desks and chairs. Although PRS did not pay rent to BNSF, the lift rate reflected the office and equipment benefits PRS received – absent them, PRS would have charged four times the negotiated rate.

The Intermodal Agreement mandated that PRS employees comply with BNSF's safety and environmental rules, traffic control requirements, speed limits, and operating policies. Hostlers were to be furnished with devices that restricted their speed to no more than 25 mph. PRS employees had to wear protective equipment, and all vehicles had to be equipped with emergency flashers, flashing strobe lights, and approved steel cages or bars. PRS also had to prepare and implement an environmental management plan and comply with numerous internal and external publications. When an accident resulting in injury or damage occurred, PRS was required to notify BNSF. The Intermodal Agreement could be terminated by BNSF if PRS failed to properly load or secure containers or trailers to railcars or chassis or furnished incorrect data regarding loading and unloading times.

BNSF paid PRS an agreed upon rate for each "lift to or from a railcar" and monthly compensation amounts for each service. PRS was also eligible for a monthly incentive payment based upon its performance.

The amounts PRS billed to BNSF generally covered PRS's expenses for each month but not always. PRS was responsible for damage beyond normal wear and tear

---

[3] A hostler is a six-wheeled tractor used to transport trailers during the loading and unloading of trains.

it caused to the terminal, and it was required to reimburse or pay a penalty to BNSF for misdirected shipments, improperly loaded or secured units, failure to complete work timely and appropriately, and supplying incorrect data.

The Intermodal Agreement contained numerous indemnity provisions, including an express indemnity clause protecting and indemnifying BNSF from the "strict liability" resulting from violations or alleged violations of federal, state, and local laws, FELA being expressly named. PRS also had to purchase a number of insurance policies, including FELA coverage, with the endorsement naming BNSF as the "Alternate Employer." The Intermodal Agreement clarified that "Alternate Employer" was "used solely as an insurance term of art" and that PRS was "in no way intending or evidencing an alternate or dual employment relationship with" BNSF. The workers' compensation and employer's liability insurance policies had to contain specific waivers of the insurance company's subrogation rights against BNSF, and PRS agreed to waive its right of recovery for all claims and suits against BNSF.

Campbell was a PRS hostler driver. His hostler was equipped with a radio owned by PRS and a BNSF-owned computer running the OASIS software. Using OASIS, Campbell selected a container, and OASIS apprised him of its location. With his hostler, Campbell then transported the container to the designated rail car, where it was lifted onto a train by a BNSF-owned crane. Throughout his shift, Campbell's supervisors communicated with him via his radio.

BNSF had no input regarding PRS's decision to hire Campbell. Campbell received his safety training from PRS's safety director, and a PRS employee taught him how to drive a hostler. At one point during his employment with PRS, Campbell was disciplined by PRS for a work-related incident. BNSF had no knowledge that the infraction occurred.

On April 28, 2006, the day of the accident, PRS employee Michael Kutscher was Campbell's direct supervisor. Prior to Campbell's shift, Kutscher conducted his customary shift meeting for all hostler drivers, including Campbell, in which he provided instructions about their work for that day and how the work should be completed. No

BNSF employee was present at the meeting.  That morning, a PRS hostler rear-ended Campbell's hostler, causing injury to Campbell.  Thereafter, Campbell reported the accident to his PRS supervisor and completed a PRS accident/injury report.  Campbell received Worker's Compensation benefits from PRS through its insurance carrier.

On April 20, 2007, Campbell filed a complaint for personal injury against BNSF in the United States District Court for the Western District of Tennessee.  The complaint, which alleged negligence, asserted that BNSF was Campbell's "actual employer" and that PRS "was a merely nominal independent contractor[.]"  According to the complaint, the "purpose" of the Intermodal Agreement "was to allow BNSF to exempt itself from liability created by the FELA[.]"

On September 29, 2008, BNSF filed a motion for summary judgment arguing, in part, that Campbell was not its employee and therefore could not recover under FELA.  On December 23, 2008, while BNSF's summary judgment motion was pending, Campbell filed a motion for leave to file a first amended complaint, which:  (1) set forth more detailed allegations supporting Campbell's claim that he was BNSF's sub-servant, (2) sought to withdraw his claim for ordinary negligence, and (3) asserted a claim for punitive damages.  The district court granted Campbell's first two requests but denied his request to seek punitive damages on the ground that FELA did not provide for punitive damages.

Thereafter, Campbell filed a request to reconsider the district court's denial of his punitive damages claim, which also doubled as a motion for leave to file a second amended complaint adding a state-law conspiracy claim.  The district court denied Campbell's requests, holding that  an amendment adding a conspiracy claim was futile because the one-year statute of limitations period had run.

On April 22, 2009, the district court granted BNSF's motion for summary judgment.  Campbell timely appeals.

II.

Campbell argues that the district court erred in holding that he was not BNSF's "employee" under FELA. We review the district court's grant of summary judgment de novo. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009).

FELA provides the exclusive remedy for employees of interstate railroads to recover from a railroad for injuries incurred during the course of their employment. *Wabash R.R. Co. v. Hayes*, 234 U.S. 86, 89-90 (1914). FELA states, in relevant part:

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . .

45 U.S.C. § 51. FELA thus applies to (1) a "common carrier by railroad" and (2) a person "employed" by that railroad carrier. The parties agree that PRS is not a "common carrier by railroad" and that BNSF is. To recover under FELA then, Campbell must show that he was BNSF's employee.

"[T]he words 'employee' and 'employed' in [FELA] [are] used in their natural sense, and were intended to describe the conventional relation of employer and employe [sic][,]" that is, a "master-servant" relationship "to be determined by reference to common-law principles." *Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974) (citation and internal quotation marks omitted). The United States Supreme Court has stated that, under the common law,

> there are basically three methods by which a plaintiff can establish his "employment" with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. Second, he could be deemed to be acting for two masters simultaneously. Finally, he could be a subservant of a company that was in turn a servant of the railroad.

*Id*. at 324 (internal citations omitted). Campbell concedes that only the last method – "subservant of a company that was in turn a servant of the railroad" – applies. To

prevail under this theory, Campbell must demonstrate that he was acting as BNSF's servant at the time of his accident. *See id.* at 325.

In determining whether a plaintiff was a subservant of a company that was in turn a servant of the railroad under FELA, the Supreme Court has looked to the Restatement (Second) of Agency. *Id.* at 324 ("While [section 220(2) of the Restatement] is directed primarily at determining whether a particular bilateral arrangement is properly characterized as a master-servant or independent contractor relationship, it can also be instructive in analyzing the three-party relationship between two employers and a worker."); *see also Warrington v. Elgin, Joliet & E. Ry. Co.*, 901 F.2d 88, 90 (7th Cir. 1990). Section 220(1) of the Restatement (Second) of Agency defines a "servant" as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." Section 220(2) "recites various factors that are helpful in applying that definition."[4] *Kelley*, 419 U.S. at 324. In addition to the Restatement (Second) of

---

[4]The factors include:

[1]    the extent of control which, by the agreement, the master may exercise over the details of the work;

[2]    whether or not the one employed is engaged in a distinct occupation or business;

[3]    the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

[4]    the skill required in the particular occupation;

[5]    whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

[6]    the length of time for which the person is employed;

[7]    the method of payment, whether by the time or by the job;

[8]    whether or not the work is a part of the regular business of the employer;

[9]    whether or not the parties believe they are creating the relation of master and servant; and

[10]   whether the principal is or is not in business.

Agency criteria, Campbell relies upon factors used by the Internal Revenue Service. *See* Rev. Rul. 87-41, 1987-1 C.B. 296.[5]

Campbell's attempt to characterize himself as BNSF's employee fails. The undisputed evidence demonstrates that BNSF had no right to control, nor did it attempt to exercise control over, the manner and details of PRS's work. *See Kelley*, 419 U.S. at 325. In fact, BNSF did not have the personnel in place to do so – it employed a single worker, Andrew Scott Jenkins, at the terminal. Jenkins did not work 24 hours a day, seven days a week at this around-the-clock operation requiring 140 PRS employees, and his role was limited to observation, rather than control.

PRS employed its own managers and supervisors. Those personnel held safety meetings before each shift, and they coordinated, directed, and assigned the work to be performed. BNSF had no authority in the crucial areas of hiring, training, evaluating, disciplining, and terminating PRS employees; those tasks were exclusively under PRS's control.

BNSF also played little, if any, role in Campbell's accident. In this regard, PRS employed Campbell and the worker who rear-ended him, and it owned both of the hostlers involved in the accident. Campbell was trained to drive his hostler by another PRS employee. PRS disciplined Campbell on a prior occasion, and revealingly, BNSF had no knowledge of it. Only Campbell and other PRS workers entered information into the OASIS program, which coordinated and tracked their work that day. Only PRS managers and supervisors gave Campbell his job instructions.

Nor could PRS be properly characterized as BNSF's alter ego. PRS had substantial business relationships outside of its dealings with BNSF, and it operated several intermodal rail facilities for various companies throughout the United States.

---

[5]The IRS factors pertain to: instructions; training; integration; services rendered personally; hiring, supervising, and paying assistants; continuing relationship; set hours of work; full time required; doing work on employer's premises; order or sequence set; oral or written reports; payment by hour, week, month; payment of business and/or traveling expenses; furnishing of tools and materials; significant investment; realization of profit or loss; working for more than one firm at a time; making service available to general public; right to discharge; and right to terminate.

The Intermodal Agreement did not require PRS or any of its employees to work exclusively for BNSF, and PRS had complete authority over its employees' schedules. PRS could employ or assign any number of workers to the terminal, and its actions, in large part, determined its profits. PRS was paid per lift. Moreover, the 32 to 33 hostlers PRS owned, at a cost of $20,000 to $60,000 each, constituted a substantial expenditure atypical of a servant; and if a hostler broke, PRS would have borne the financial loss. Although BNSF provided PRS with office, maintenance, and repair space, as well as various amenities, these benefits were bargained for under the Intermodal Agreement. PRS would have charged four times its rates had BNSF not provided them.

All of this evidence demonstrates overwhelmingly that PRS controlled, and had the exclusive right to control, its employees as BNSF's independent contractor. Campbell's arguments to the contrary are without merit. BNSF's "restrictions" upon PRS's hiring practices, specifically, its prohibitions against employing terminal workers with criminal records or without authorization to work in the United States, do not demonstrate BNSF's right to control PRS. To be sure, many, if not most, employers place identical limitations on employment, and these minimal screening criteria did not circumscribe PRS's applicant pool in any significant way or compel PRS to hire or assign to the terminal applicants who were selected by BNSF.

Similarly unavailing is Campbell's argument that BNSF controlled PRS by requiring it to adhere to anti-discrimination laws. Compliance with the law was not a BNSF mandate; rather, it was a legislative command.

PRS's obligation to conform to BNSF's safety requirements; produce an environmental compliance plan; perform security inspections after loading; adhere to BNSF's internal and external publications; complete its loading and unloading operations in accordance with BNSF's hub standards and transportation plan; and submit proficiency audits were mutually agreed upon practices that merely insured worker and premises safety. It was certainly reasonable for BNSF, the rail yard property owner, to be concerned about workers performing potentially hazardous work on its land. Significantly, PRS was responsible for *implementing* these policies on a daily basis,

conducting safety meetings before each shift, supervising its employees, and insuring their safe and adequate performance while on the job. *See Kelley*, 419 U.S. at 331 ("[T]he District Court found no [] *day-to-day* supervision that would support a finding that petitioner and his coworkers were, in effect, employees of the railroad.") (emphasis added).

Contrary to Campbell's implied characterization, BNSF's OASIS software was not a "big brother" keeping watchful eye over PRS or controlling how PRS performed its work; rather, it coordinated the work of both companies. *See id.* at 330 (stating that "contacts" between a railroad company and its contractor "may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation."). BNSF's contacts with the software was passive – it could only view the data but could not enter it as a means to control PRS's work.

Campbell's argument that BNSF controlled PRS by imposing upon it "onerous" indemnification and insurance requirements is likewise untenable. Campbell neither cites authority nor makes any persuasive argument that a company which hires another to perform intense manual labor on its premises must forego certain protections so as not to risk being considered an employer under FELA. In any event, protection from liability does not constitute control over the manner and details of a contractor's work.

The two cases upon which Campbell relies, *Baker v. Texas & Pac. Ry. Co.*, 359 U.S. 227 (1959) and *Breaux & Daigle, Inc. v. United States*, 900 F.2d 49 (5th Cir. 1990), are distinguishable from the present case. Baker was hired by a contractor for a railroad, and his "work consisted of 'grouting,' or pumping sand and cement into the roadbed to strengthen and stabilize it." 359 U.S. at 227. When he was struck by a train and killed while working, his representatives filed suit under FELA, arguing that Baker was an employee of the railroad company. *Id.* The district court held that Baker was not a railroad employee as a matter of law, but the Supreme Court reversed and held:

> [T]he petitioners introduced evidence tending to prove that the grouting
> work was part of the maintenance task of the railroad; that the [rail]road

furnished the material to be pumped into the roadbed; and that a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture. The railroad introduced evidence tending to controvert this and further evidence tending to show that an employment relationship did not exist between it and Baker at the time of the accident. An issue for determination by the jury was presented.

*Id.* at 228-29. In contrast to *Baker*, no BNSF employee "in the *daily* course of the work exercised directive control over the details of the job performed by the individual [PRS] workmen[.]" *Id.* (emphasis added). Thus, there is no genuine issue of material fact that would justify submission to a jury in the present case. *Cf. Warrington*, 901 F.2d at 91 (affirming the district court's directed verdict against a plaintiff on his claim that he was a subservant of an employer that was in turn a servant of the railroad because the evidence showed that the railroad had no control over the contractor's movement of cars between and along tracks using bulldozers owned by the contractor).

*Breaux & Daigle, Inc.* is also distinguishable because the issue there was employer tax liability, not liability under FELA. More importantly, *Breaux & Daigle, Inc.* involved a two-party relationship between an employer (a crab meat processor and seller) and its workers (crab meat pickers), not a three-party relationship between two employers and a worker as in the present case. The distinction is significant. The crab meat pickers in *Breaux & Daigle*, *Inc.*, unlike the PRS employees, were not under the control of an intervening corporate entity separate and apart from their alleged "employer."

The facts in the present case are similar to those in *Sullivan v. Consolidated Rail Corp.*, 459 N.E.2d 513 (Ohio 1984). In *Sullivan*, the plaintiff was employed by Pennsylvania Truck Lines, Inc. ("PTL"), a wholly-owned subsidiary of a railroad. *Id.* at 514. He was injured while loading trailer vans onto railroad cars owned by the railroad. *Id.* Although the railroad company did not have direct supervisory control over the plaintiff's actions, the plaintiff argued that his work was "sufficiently under the control of the railroad to bring him within coverage of the FELA." *Id.* A "Terminal

Services Agreement" was "the only mode of control" the railroad had over the plaintiff's conduct. *Id.* In affirming the trial court's grant of summary judgment to the railroad on the ground that the plaintiff was not its employee, the Supreme Court of Ohio stated:

> We have no difficulty in determining from the record that PTL is an agent of its parent company. A finding of agency is not tantamount, however, to a finding of a master-servant relationship, as the traditional right to control test would be met only if it were shown that the role of the subsidiary company was that of a conventional common-law servant.
>
> The record clearly demonstrates that appellee did not have the right to control the daily operations of PTL or its employees. The companies were sufficiently distinct in organization and responsibility. Employees of the railroad did not play a significant supervisory role in the loading and unloading of railroad cars. In fact, only in the rare absence of a PTL supervisor did appellee's employees control the activities of PTL employees. We believe the interaction between companies, in the main, rises only to the passing of information and coordination which is required in such a large operation.
>
> We hold, therefore, that a railroad is not liable under the FELA for injuries to an employee of its wholly owned subsidiary corporation when the railroad did not possess the right to control the employee's action, but did control other aspects of the subsidiary's business.

*Id.* at 515 (citation omitted); *see also Dominics v. Illinois Cent. R.R. Co.*, 934 F. Supp. 223, 226-27 (1996) (S.D. Miss. 1996) (holding that a worker employed by a railroad grinding contractor was not an employee of the railroad company under FELA as a matter of law because, although the railroad provided a rail supervisor to follow the grinding train and insure that any sparks caused by the grinding operation did not set anything on fire, the railroad did not supervise the contractor's employees).

For these reasons, we hold that the district court did not err in granting summary judgment to BNSF on Campbell's FELA claim because Campbell was not BNSF's employee.

III.

Campbell argues that the Intermodal Agreement declaring PRS an independent contractor was intended to circumvent FELA and is therefore void under 45 U.S.C. § 55. He also asserts that § 55 bars BNSF from asserting its defense that Campbell was not its employee. 45 U.S.C. § 55 provides, in relevant part:

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter [45 U.S.C. § 51 *et seq*.], shall to that extent be void[.]

The district court granted summary judgment to BNSF on these issues, holding that § 55 "was 'intended to bar a defense, presented in a suit for damages under FELA, based upon an employee's relinquishment of rights under FELA' and 'was not intended to afford a cause of action, separate from that for recovery of damages for injury under FELA, against an employer that engages in a device to exempt itself from FELA liability.'" (quoting *Bay v. W. Pac. R.R. Co.*, 595 F.2d 514, 516 (9th Cir. 1979)). According to the district court, Campbell's § 55 claim failed because BNSF "did not assert the [Intermodal Agreement] as a defense to [Campbell's] claims; furthermore, [Campbell] was not a party to the [Intermodal Agreement] and has not shown how the agreement in any way constitutes a 'relinquishment' of his rights."

In his appeal of these issues, Campbell merely restates his arguments addressing whether he was BNSF's employee under FELA. He also implies that BNSF and PRS conspired to exempt BNSF from FELA liability. However, Campbell cites no authority allowing him to either assert a cause of action based upon 45 U.S.C. § 55 or invoke the statute to eliminate BNSF's non-employee defense. In fact, Campbell's assertion that the Intermodal Agreement was intended to exempt BNSF from FELA liability merely begs the primary question – whether PRS and Campbell were BNSF's servants. As we held previously, the district court did not err in ruling that they were not. For these reasons, we hold that the district court did not err in its summary judgment dismissal of Campbell's 45 U.S.C. § 55 "claim" and in permitting BNSF's non-employee defense.

IV.

Campbell contends that the district court's denial of his request to amend his complaint to add a claim for civil conspiracy under Tennessee law was erroneous. The proposed amendment alleged that BNSF conspired with PRS to avoid FELA liability. In denying Campbell's request to amend, the district court held that: (1) allowing the amendment would be futile because the one-year statute of limitations had run; (2) the discovery rule did not toll the limitations period; and (3) the proposed amendment did not relate back to the filing date of the original complaint under Federal Rule of Civil Procedure 15(c).

When the district court denies a motion to amend on futility grounds, we review that ruling de novo. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008). An amendment is futile if it would not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). To overcome a Rule 12(b)(6) dismissal, "the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'" *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal citation omitted) (alteration in original). In addition, "we may affirm on any grounds supported by the record even if different from the reasons of the district court." *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (citation and internal quotation marks omitted).

We affirm the district court's denial of Campbell's motion to amend on the ground that Campbell has failed to state a plausible claim for civil conspiracy under Tennessee law.[6] "It is well settled in Tennessee that the tort of civil conspiracy requires underlying wrongful conduct, and that conspiracy, standing alone, is not sufficient to support a cause of action[.]" *Greene v. Brown & Williamson Tobacco Corp.*, 72 F.

---

[6]Because the proposed amended complaint does not state a claim for civil conspiracy, it is unnecessary for us to decide whether the proposed complaint is also time-barred.

Supp. 2d 882, 887 (W.D. Tenn. 1999). "If the underlying wrongful conduct is found to be not actionable then the conspiracy claim must also fail." *Id.* In the present case, Campbell's allegations do not plausibly suggest that the business arrangement between BNSF and PRS, in which PRS agreed to perform loading and unloading work for BNSF, was wrongful and an actionable conspiracy under Tennessee law.

V.

For these reasons, we affirm the judgment of the district court.**7**

---

**7**In his reply brief, Campbell argues that the district court erred by entering summary judgment on his initial complaint which, according to Campbell, was a "dead pleading" because it was subsequently amended. BNSF has moved to strike Campbell's reply brief, asserting that Campbell failed to raise the issue in his response to the motion for summary judgment and in his initial appellate brief. In view of our disposition, we choose not to address the issue and deny as moot the motion to strike.