# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2021

Lyle W. Cayce
Clerk

No. 20-30693

James Wheeler,

*Plaintiff–Appellant*,

*versus*

Norfolk Southern Railway Company; Unidentified Parties,

*Defendants–Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-cv-1021

Before Smith and Ho, *Circuit Judges*, and Barker, *District Judge*.*

J. Campbell Barker, *District Judge*.

　　James Wheeler was employed by Hulcher Services, Inc. while working at a New Orleans railyard. After he lost several fingers in an accident at the railyard, he sued the railyard's owner, Norfolk Southern Railway Company,

---

* U.S. District Judge for the Eastern District of Texas, sitting by designation.

under a federal law that allows suit by railroad employees injured on the job. *See* Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.* That claim presented the question whether Wheeler was an employee of Norfolk. On summary judgment, the district court held that he was not, so he could not recover under FELA. Wheeler now appeals. Because he does not show that Norfolk controlled the performance of his work or retained the right to do so, we affirm the district court's judgment.

## I.

Norfolk asked Hulcher to clean up a derailment at Norfolk's New Orleans railyard, and Hulcher assigned Wheeler and other Hulcher employees to the project. At the time, Wheeler had worked for Hulcher for about three months, serving over a dozen Hulcher customers. He had never before worked at Norfolk's railyard.

The Hulcher crew serviced the derailment site and was packing up its heavy equipment when a novice Hulcher employee made a dangerous error. The employee failed to reverse a cable line that Wheeler was holding while rigging down a boom. The slack in the line evaporated in an instant, trapping Wheeler's right hand between a heavy steel cable and a load line. His middle, ring, and pinky fingers were severed.

Wheeler brought and settled a workers-compensation claim against Hulcher. He then brought this FELA suit, alleging that he was Norfolk's employee and was injured by its negligence. To show his employee status, Wheeler relied on (1) the agreement between Hulcher and Norfolk and (2) the testimony of two Norfolk supervisors on duty during his accident. Those materials are described in further detail below.

**1.**     Hulcher performed work for Norfolk under a Master Agreement for Derailment Cleanup and Repair Services. It provided for Hulcher

to work on derailments on an "as-needed, as-requested basis," with Norfolk not required to use Hulcher for any given derailment.

If requested to work on a derailment, Hulcher was required to provide trained personnel, equipment, and services to clean up the derailment site. Its work would include "(a) clearing, removing and/or rerailing locomotives, railcars and other rolling stock; (b) repair, reconstruction and replacement of damaged or destroyed trackage or track components . . . ; and (c) such other services as [Norfolk] may request to complete repair and cleanup of a derailment site." Norfolk determined the scope of those services and the equipment to be used on a case-by-case basis.

The agreement obligated Hulcher to "respond[] to derailments as promptly as possible . . . twenty-four (24) hours per day, seven (7) days per week." Regarding personnel, the agreement required Hulcher to follow federal law and mandated that Hulcher perform certain background checks on any employee assigned to the Norfolk railyard. The agreement provides that "[n]othing in this background investigation requirement [prevents Hulcher] from hiring any particular individual or requiring [Hulcher] to terminate such individual if already hired[.]" The agreement also imposes some of Norfolk's internal rules on Hulcher and its employees. For example, it requires Hulcher employees to comply with Norfolk's safety rules, attend job briefings conducted by Norfolk, stay up to date on environmental and hazardous-materials trainings, and wear safety gear at derailment sites.

The paragraph titled "Independent Contractor" states that Hulcher would "remain an original and independent party[.]" Hulcher's services were to be "its own separate business, under its management, supervision and direction." The agreement provides that Hulcher was to "employ, pay[,] . . . and discharge all persons engaged in the performance of" its services, and those persons were to "remain the sole employees of [Hulcher]." Nothing in

the agreement "is intended to create a joint venture or to constitute either party as agent . . . of the other."

The agreement gives Norfolk employees the right to inspect Hulcher's work and demand that Hulcher remedy any deficiencies. It also provides that Norfolk may assign its personnel to work alongside or in the vicinity of Hulcher employees, and it clarifies that the employees of each party "shall remain under the direction and control of [their] supervisors, there being no intention to render the employees of either as 'loaned' employees of the other[.]"

2.   Wheeler submitted a declaration alleging that Norfolk employees "had the right to direct [his] work if they desired" and that, if they had directed him to do something, he "would have done it." He claims that he understood that he was supposed to follow Norfolk's safety rules, that he should stop if ordered to do so by a Norfolk employee, and that his failure to do either could lead to his removal from Norfolk's railyard. Wheeler supports his claims with the testimony of two Norfolk employees.

First, Wheeler relies on the testimony of Stacey Brown, Norfolk's Senior General Foreman at the railyard. Although Brown was on duty the day that Wheeler was injured, Brown was unaware the accident had occurred. Brown was Norfolk's point person for Hulcher's services at the railyard. In the event of a derailment, Brown would call Hulcher and tell them the scope of the project and what equipment he believed was needed. Hulcher would then determine the number of its employees needed to clean up the site.

Brown stated that he did not make a habit of policing how Hulcher employees entered the yard, but he agreed that he had the authority to do so. He also agreed that he could order a Hulcher employee to stop working "for any reason." He represented that he did not have authority to order Hulcher employees to do something in a particular way, however, and that "I just tell

[the Hulcher employee] to stop, and then his supervisor would determine how they're going to do it." Brown knew that he could remove a contractor from the railyard, but he had never heard of someone's being removed in his 22 years at Norfolk.

Second, Wheeler relies on the testimony of Preston Hunter, the Norfolk yardmaster on duty during the accident. Hunter too was unaware of Wheeler's accident until this lawsuit was filed. As the yardmaster, Hunter controlled the railyard, but he never interacted with Hulcher or directly supervised its work or crews. He explained that, when a derailment occurs, Norfolk's mechanical department asks for permission to clear the affected tracks, after which the mechanical department contacts Hulcher. Hunter acknowledged that he could order the mechanical department to stop Hulcher from working in an emergency or if he saw something unsafe. But he stated, "that's just something I would never . . . do[,]" because from where Hunter was located in the tower, he "really wouldn't know what Hulcher is doing[.]"

## II.

Employment by a railroad is required for a plaintiff to recover under FELA. 45 U.S.C. § 51. Whether an injured worker was acting as an employee of a railroad at the time of an injury is a question of fact. *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985). The district court entered summary judgment for Norfolk, holding that no genuine dispute of material fact existed on that point and that the record would not support a finding that Wheeler was Norfolk's employee at the time of his accident. On appeal, we review that summary judgment de novo.

In FELA, the words "employee" and "employed" are used in their natural sense, so principles of common law govern the issue of employment. *Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974). At common law, a person may

No. 20-30693

establish his employee status, despite his nominal classification as an independent contractor, under three recognized doctrines. As applied to a railroad, the person could (1) be the railroad's borrowed servant, (2) serve two employers simultaneously, or (3) be a subservant of a company that in turn serves the railroad. *Id.* at 324. Under each of those doctrines, a worker's employment status turns on "whether the railroad has control of the employee or the right to control the employee." *Lindsey*, 775 F.2d at 1324.

The railroad need not have full supervisory control, but its supervisory role must be significant. *Id.* The mere reservation of authority to ensure performance as contemplated by a contract is not sufficient control to turn a nominal contractor into an employee. *See Sullivan v. Gen. Elec. Co.*, 226 F.2d 290, 291 (6th Cir. 1955). The control necessary to establish an employment relationship is also more than just the power of "mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Kelley*, 419 U.S. at 329 (cleaned up). Likewise, "the passing of information and the accommodation . . . obviously required in a large and necessarily coordinated operation" do not prove sufficient supervisory control. *Id.* at 330 (citation omitted). Rather, to establish an employment relationship, the communications between the railroad and the contractor "must assume a supervisory character." *Id.*

Under those standards and on the summary-judgment record here, Wheeler's argument that he was Norfolk's employee fails as a matter of law. The undisputed evidence demonstrates that Norfolk did not control the manner and details of Wheeler's work, nor did it retain the right to do so. *See id.* at 325.

First, Norfolk personnel did not, in fact, supervise Wheeler's work. Wheeler identifies no instance in which a Norfolk employee instructed him to do something. The only Norfolk employees whom he identifies as being in

the railyard at the time of his accident—Brown and Hunter—were not even aware of the accident until this suit was filed. *Cf. Lindsey*, 775 F.2d at 1324 (upholding a finding of employee status based in part on testimony that workers "received specific orders and instructions from [railroad] employees").

Nor does Wheeler identify evidence that Norfolk personnel had the right of significant supervisory control over his work. Wheeler points to Hunter's general authority over the railyard and Brown's authority to tell anyone there to stop working. But those facts do not, alone or in conjunction with the other evidence, support a finding of significant supervisory control over Wheeler's rerailment work. This is not a case like *Baker v. Texas & Pacific Railway Co.*, 359 U.S. 227 (1959). There, the evidence sufficed to raise a question for the jury on employee status because a railroad supervisor "exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture." *Id.* at 228–29. Here, in contrast, the evidence could show only a retained authority by Brown and Hunter to order a Hulcher employee to stop working at the railyard—a far cry from the directive control described in *Baker*. It falls short of the affirmative control necessary to allow a finding of substantial supervisory power. It also stands in contrast with the directive control described in *Collins v. Union Pacific Railroad Co.*, 143 Cal. Rptr. 3d 849, 857–59 (Cal. Ct. App. 2012), on which Wheeler relies. There, the railroad employees would tell a worker "what [they] wanted done and *how to do it*." *Id.* at 859 (emphasis added). Here, the record lacks such evidence.

Second, no evidence shows that Wheeler's selection for Hulcher's work at the railyard was directed by Norfolk. Wheeler helped service over a dozen other Hulcher customers before starting the Norfolk project, and no evidence shows that anyone but Hulcher decided when and where Wheeler would be assigned. Hulcher retained complete authority over its employees'

schedules. The Norfolk–Hulcher agreement does not give Norfolk the power to hire employees for Hulcher or require any specific Hulcher employee to work at Norfolk's railyard. Hulcher was required to provide a sufficient workforce, not a specific workforce. And it is uncontroverted that Hulcher paid Wheeler's wages.

Wheeler relies on the master agreement's requirements that Hulcher employees pass a background check, follow Norfolk safety rules, and attend job briefings and safety meetings. The Sixth Circuit addressed similar arguments in *Campbell v. BNSF Railway Co.*, 600 F.3d 667 (6th Cir. 2010), holding that such requirements are unsurprising in the context of an independent-contractor relationship: "[i]t was certainly reasonable for [the railroad] . . . to be concerned about workers performing potentially hazardous work on its land[,]" *id.* at 674. That reasoning applies with equal force here.

Third, the Norfolk–Hulcher agreement disclaims authority by either company to terminate or demand the termination of the other company's employees. Norfolk did not have authority to terminate Wheeler from Hulcher's employment. Wheeler argues that Norfolk had authority to ban him from the railyard, but he fails to explain why that is any different than the authority Norfolk could exercise against a trespasser, especially where Hulcher had numerous other customers. It does not support a finding of employment by Norfolk. *See Robertson v. Yazoo & Miss. Valley R.R. Co.,* 159 F.2d 31, 31 n.1, 35 (5th Cir. 1947) (acknowledging a railroad's power to remove a contractor's employees from its railyard but nonetheless holding that a worker failed to raise a fact issue as to his employment by the railroad).

Fourth, Hulcher was responsible for bringing the necessary equipment to the railyard. The agreement does give Norfolk authority to designate equipment for Hulcher to bring, but Wheeler fails to explain why that step goes beyond the cooperation "obviously required in a large and necessarily

coordinated operation." *See Kelley*, 419 U.S. at 330 (citation omitted). The ability to designate the equipment that Hulcher will bring allows Norfolk to anticipate the cost of each engagement with Hulcher. And the fact that Hulcher owned and provided its own specialized equipment for servicing derailments implies that Wheeler was an independent contractor, not Norfolk's employee, in performing that work. *Cf. Watts v. Mont. Rail Link, Inc.*, 975 P.2d 283, 292–93 (Mont. 1999) (concluding that a contractor's reliance on a railroad for "tools, equipment, and parts[,]" among other factors, established an employment relationship).

Fifth, although the work was performed at Norfolk's railyard, that seems almost unavoidable when an independent contractor's line of work is cleaning up derailments. As the district court recognized, the place of injury alone is insufficient to create an issue of fact as to a worker's employment by a railroad. *See Campbell*, 600 F.3d at 674, 676 (upholding summary judgment in favor of a railroad although a contractor was injured on railroad property).

Finally, Wheeler gains no ground in arguing that reliance on the Norfolk–Hulcher agreement is barred by § 55 of FELA. Section 55 reads in pertinent part: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void[.]" 45 U.S.C. § 55. Wheeler argues that § 55 prevents Norfolk from "escap[ing] FELA liability by contracting out its railroad activity to third parties[.]" But Wheeler failed to raise this argument in district court, so it is forfeited. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999). In any event, Wheeler cites no authority applying § 55 to bar a railroad's argument that a contract for services shows that a worker of the service provider was not an employee of the railroad. The distinction between an employee and an independent contractor underlies and defines the scope of FELA liability; it is not an "exempt[ion]" from that liability under that Act. *See Robinson v.*

*Balt. & Ohio R.R. Co.*, 237 U.S. 84, 94 (1915) (remarking that Congress, aware "that there were . . . persons engaged in various services for other masters" on railroads, "did not use any appropriate expression . . . indicat[ing] a purpose to include such persons . . . under the act").

\* \* \*

Summary judgment for Norfolk is proper because Wheeler cannot satisfy the railroad-employee element of his FELA claim. Accordingly, the judgment of the district court is affirmed.