# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2024

Lyle W. Cayce
Clerk

_____

No. 23-30709

_____

Dakota Hanley,

*Plaintiff—Appellant*,

*versus*

Illinois Central Railroad Company,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-258

_____

Before Higginson, Willett, and Oldham, *Circuit Judges*.

Per Curiam:*

Dakota Hanley sued the Illinois Central Railroad Company pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* The district court granted summary judgment on the grounds Hanley was not a railroad employee. We affirm.

_____

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30709

I.

Illinois Central Railroad Company ("ICRC") operates a railroad line along the southern edge of Lake Pontchartrain and across the terminus of the Bonnet Carre Spillway. Where the line crosses the Spillway, the track is elevated on a bridge. In 2017, ICRC contracted with OCCI, Inc. ("OCCI") to build a new bridge. OCCI agreed to "furnish all material, supervision, labor, equipment, tools, supplies, incidentals, and transportation" needed for the Spillway project. ROA.122. To complete the project, OCCI built a specialized "bridge builder."

ICRC and OCCI coordinated and communicated throughout the construction of the new bridge because the construction's location and complexity presented several challenges. For instance, the new bridge is located approximately fifty feet from the old tracks, and OCCI workers had to cross the old tracks to reach the construction site. But ICRC did not shut down the old track during construction. Instead, because the old track remained open to live rail traffic, an ICRC Employee-in-Charge ("EIC") coordinated movement across the live tracks to offer "track protection" and issued "stop orders" when safety concerns arose. ROA.142; 183.

ICRC also provided morning and afternoon job briefings to OCCI employees. Those briefings included the track protection concerns for the day, a "forecast" of the day's train schedule, general work-site rules, and safety warnings based on the day's scheduled projects. After the briefings, OCCI employees broke into their work groups and received their day's tasks from an OCCI foreman. In addition to daily tasks, OCCI foremen answered workers' questions, assigned discrete tasks, and directed the "means to accomplish the work for OCCI laborers." ROA.261–62. At times, the OCCI foremen and superintendents would communicate with ICRC personnel—

particularly ICRC Vice President Raymond Baker—to ensure the bridge construction was safe and compliant with contractual specifications.

Dakota Hanley was an OCCI employee working on the Spillway project. On June 25, 2019, Hanley slipped and fell off a ladder on OCCI's bridge builder at the Spillway construction site, injuring his knee. Hanley sued ICRC under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, claiming damages for his injuries as a "borrowed" railroad employee. ICRC moved for summary judgment, contending Hanley was not a railroad employee. The district court granted summary judgment, and Hanley timely appealed.

## II.

FELA imposes liability on railroad common carriers engaged in interstate commerce for "damages to any person suffering injury" caused by the carrier's negligence "while he is employed by such carrier in such commerce." 45 U.S.C. § 51. FELA defines an "employee" as:

> Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.

*Id.*

The Supreme Court has held "[FELA] does not use the terms 'employee' and 'employed' in any special sense." *Baker v. Tex. & Pac. Ry. Co.*, 359 U.S. 227, 228 (1959). Rather, FELA requires "proof of a master-servant relationship between the plaintiff and the defendant railroad . . . determined by reference to common-law principles." *Kelley v. S. Pac. Co.*,

419 U.S. 318, 323 (1974). Our court has in turn recognized three doctrines under which a person could be considered an "employee" for FELA purposes, despite being a contractor paid by another company: "the person could (1) be the railroad's borrowed servant, (2) serve two employers simultaneously, or (3) be a subservant of a company that in turn serves the railroad." *Wheeler v. Norfolk S. Ry. Co.*, 6 F.4th 626, 630 (5th Cir. 2021). Under all three doctrines, "a worker's employment status turns on 'whether the railroad has control of the employee or the right to control the employee.'" *Id.* (quoting *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985)).

To establish a right of control over a worker, "the railroad need not have full supervisory control, but its supervisory role must be significant." *Id.* "The mere reservation of authority to ensure performance as contemplated by a contract is not sufficient control to turn a nominal contractor into an employee." *Id.* And "the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation" does not evince sufficient "direction or control" to establish significant supervision. *Kelley*, 419 U.S. at 330; *see also Wheeler*, 6 F.4th at 631.

"Generally, whether an injured worker was acting as an employee at the time of injury is a question of fact for the jury." *Lowery v. Ill. Cent. Gulf R.R. Co.*, 891 F.2d 1187, 1191 (5th Cir. 1990). "Only if reasonable persons could not reach different conclusions on whether a claimant was an employee of the railroad at the time of his injury may the question be taken from the jury." *Ibid.*; *see also Baker*, 359 U.S. at 228. Our review is de novo. *See Union Pac. R.R. Co. v. City of Palestine*, 41 F.4th 696, 703 (5th Cir. 2022).

III.

Hanley contends ICRC "borrowed" him as an employee. We agree with the district court that Hanley failed to create a triable issue of fact on that point.

The OCCI/ICRC agreement and employee testimony establish that ICRC did not have supervisory control over OCCI employees like Hanley. The contract required OCCI to supply, supervise, and pay its laborers. It gave OCCI discretion to make labor arrangements, so long as "the Work [was] done by [OCCI] in a safe, efficient, and workmanlike manner . . . consistent with the achievement of the result contracted for." ROA.126. And the employee testimony from both OCCI and ICRC employees similarly evinced OCCI's control. An OCCI Human Resources Specialist, Hanley's OCCI foreman, an ICRC supervisor, and ICRC Vice President Baker all confirmed OCCI's control over who worked on the Spillway project, what work each laborer did, and how the work was done.

In response, Hanley presents four facts he alleges demonstrate ICRC's control over his work. None suffices, individually or collectively, to create a genuine dispute as to Hanley's employment.

First, Hanley asserts ICRC had "stop work authority," meaning the railroad EIC could order all work to cease if, for example, an unexpected train jeopardized worker safety at the site. ROA.281. But the mere ability of ICRC's supervisor to order OCCI employees to stop working—primarily for safety reasons—is "a far cry from the directive control" found sufficient in *Baker*. *Wheeler*, 6 F.4th at 631; *see also Baker*, 359 U.S. at 228–29 (relying on supervision over "the details of the job performed by the individual workmen"). Stop work authority therefore does not amount to "significant supervisory control" sufficient to support a FELA claim. *See Wheeler*, 6 F.4th at 631; *Baker*, 359 U.S. at 228–29 (relying on "directive control").

Second, Hanley points to the EIC's "track protection" role. True, the employee-in-charge could control the flow of workers and vehicles across the active railroad tracks to the construction site. But track protection falls short of demonstrating an employment relationship for largely the same reasons as the stop work authority. It was a permissive authority, at best, predicated purely on the location of the Spillway project, not on the nature of the job itself. And, given the scale of the project and the location of the new bridge, track protection was a necessity, not a way to control the construction workers. *See Kelley*, 419 U.S. at 330. The protection protocol both prevented interference with ICRC's ongoing train schedule and protected OCCI workers and equipment from dangerous encounters with oncoming trains. So this necessary communication between ICRC and OCCI also falls squarely within the "passing of information" deemed insufficient to form an employment relationship in *Kelley*.

Third, Hanley claims ICRC's daily job briefings, Risk Assessment Forms, and worksite communications (like the EIC's ability to "point out 'exceptions,' such as . . . one of [the OCCI crew] not wearing proper safety gear" or "housekeeping" issues) constitute "significant supervision" over daily construction tasks. ROA.280, 282–83. But the Risk Assessment documents and the EIC's description of his communications belie Hanley's description. The "Daily Job Briefing and Risk Assessment" sheet concerns only the general activities for the day, safety concerns at the worksite, and protocol for avoiding those concerns (such as a warning to OCCI workers to "watch [their] footing" and use fall protection gear). ROA.337. And the "housekeeping" communications merely sought to ensure the worksite remained safe and compliant with regulatory cleanliness standards. Like in *Wheeler*, ICRC's interest in maintaining a safe and clean worksite is "unsurprising in the context of an independent-contractor relationship." 6 F.4th at 632 (citing *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 674 (6th Cir.

2010)). And that reasonable concern is insufficient to convert the contractor relationship into an employment relationship. *See id.* In short, railroad responsibility for general safety conditions does not rise to the level of control over the contractor's actual work required for a finding of employment. *Cf. Kelley*, 419 U.S. at 326–27.

Fourth, Hanley contends communications between ICRC Vice President Baker and OCCI superintendents constituted supervisory control. ICRC personnel and OCCI superintendents discussed the specifications necessary to ensure the bridge would comport with the contract terms and specifications for use. Those specifications included, for example, discussing the "blow counts" for bridge piles—an indication of how deep the piles would sink and how stable the bridge would ultimately be—and pointing out damage to precast materials that would need to be repaired to ensure the bridge's safety. ROA.326–28.

But these communications do not rise to the level of "directive control" outlined in our precedents. In *Baker*, for example, a railroad supervisor communicated directly with the contracted workers, directing "the details of the job performed by the *individual workmen*, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture." 359 U.S. at 228–29 (emphasis added). And in *Lindsey*, the plaintiff submitted evidence that railroad employees gave "specific orders and instructions" to the contractor crews. 775 F.2d at 1324.

Here, no ICRC employee ever supervised Hanley's individual work. *See Wheeler*, 6 F.4th at 631 ("Wheeler identifies no instance in which a [railroad] employee instructed him to do something."). Instead, the upper-level communications sought simply to ensure "the bridge was being constructed per the specifications provided," ROA.375, not to supervise the

individual laborers' tasks. That is not enough to establish a "master-servant relationship," *Kelley*, 419 U.S. at 323, or "significant supervisory control," *Wheeler*, 6 F.4th at 631.

Altogether, it is clear ICRC "personnel did not, in fact, supervise [Hanley's] work." *See id.* Instead, ICRC's "control" over Hanley amounted to a general concern for worker safety, communications ensuring everyone on the site was aware of the day's potential hazards, and supervisor-to-supervisor communication concerning the quality of the finished product. None of these facts raises a genuine dispute that ICRC had "control of the employee or the right to control the employee." *Id.* at 630; *see also Baker*, 359 U.S. at 228–29 (relying on "directive control"). Without a showing of railroad employment, Hanley cannot bring a FELA claim.

AFFIRMED.